In re SYNTHES, INC.
SHAREHOLDER
LITIGATION.

Civil Action No. 6452.

Court of Chancery of Delaware.

Submitted: June 29, 2012.
Decided: Aug. 17, 2012.

Christine S. Azar, Esquire, Peter C. Wood, Jr., Esquire, Labaton Sucharow LLP, Wilmington, Delaware, Attorneys for Plaintiffs.

Christopher J. Keller, Esquire, Jonathan Gardner, Esquire, Matthew C. Moehlman, Esquire, Labaton Sucharow LLP, New York, New York; Robert M. Roseman, Esquire, Andrew D. Abramowitz, Esquire, Daniel J. Mirarchi, Esquire, Spector Roseman Kodroff & Willis, P.C., Philadelphia, Pennsylvania, Co–Lead Counsel for Plaintiffs.

Marc I. Gross, Esquire, Jason S. Cowart, Esquire, Gustavo F. Bruckner, Esquire, Matthew L. Tuccillo, Esquire, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, New York, New York, Additional Counsel for Plaintiffs.

Gregory P. Williams, Esquire, Kevin M. Gallagher, Esquire, Christopher H. Lyons, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; Alan S. Goudiss, Esquire, Paula H. Anderson, Esquire, Shearman & Sterling LLP, New York,

New York, Attorneys for Defendants Synthes, Inc., Hansjoerg Wyss, Robert Bland, Daniel Eicher, Charles Hedgepeth, David Helfet, Amin Khoury, Andre Mueller, Felix Pardo, Jobst Wagner, and Amy Wyss.

## OPINION

STRINE, Chancellor.

### I. *Introduction*

On this motion to dismiss, plaintiff stockholders argue that they have stated a claim for breach of fiduciary duty because a controlling stockholder refused to consider an acquisition offer that would have cashed out all the minority stockholders of the defendant Synthes, Inc., but required the controlling stockholder to remain as an investor in Synthes. Instead, the controlling stockholder worked with the other directors of Synthes and, after affording a consortium of private equity buyers a chance to make an all-cash, all-shares offer, ultimately accepted a bid made by Johnson & Johnson for 65% stock and 35% cash, and consummated a merger on those terms (the "Merger"). The controlling stockholder received the same treatment in the Merger as the other stockholders. In other words, although the controller was allowed by our law to seek a premium for his own controlling position, he did not and instead allowed the minority to share ratably in the control premium paid by J & J. The Synthes board of directors did not accept J & J's initial bid, but instead engaged in extended negotiations that resulted in J & J raising its bid substantially. The private equity group's bid for only a part of the company's equity never reached a price level as high as J & J's bid and the private equity group never made an offer to buy all of Synthes' equity.

In this decision, I dismiss the complaint. Contrary to the plaintiffs, I see no basis to conclude that the controlling stockholder had any conflict with the minority that justifies the imposition of the entire fairness standard. The controlling stockholder had more incentive than anyone to maximize the sale price of the company, and Delaware does not require a controlling stockholder to penalize itself and accept less than the minority, in order to afford the minority better terms. Rather, pro rata treatment remains a form of safe harbor under our law.

Furthermore, this case is not governed by *Revlon*, under the settled authority of our Supreme Court in *In re Santa Fe Pacific Corp. Shareholder Litigation*.[1] And even if it were, the complaint fails to plead facts supporting an inference that Synthes' board failed to take reasonable steps to maximize the sale price of the company. The complaint in fact illustrates that the board actively solicited logical strategic and private equity buyers over an unhurried time period, and afforded these parties access to due diligence to formulate offers, cites no discrimination among interested buyers, and reveals that the board did not accept J & J's offer even after it seemed clear no other bidder would top that offer, but instead bargained for more.

In sum, the facts pled do not support an inference that there was any breach of fiduciary duty on the part of the controlling stockholder or members of the board of directors. This is the second amended complaint brought by the plaintiffs, who have already been afforded some written discovery. In these circumstances, allowing the plaintiffs a fourth swing of the bat would not serve the interests of justice, and thus I grant the defendants' motion to dismiss with prejudice.[2]

---

**1.** 669 A.2d 59 (Del.1995).

**2.** *See* Ct. Ch. R. 15(aaa).

## II. *Factual Background* [3]

### A. *Synthes, Its Board, And Its Controlling Stockholder*

Before the Merger, Synthes was a global medical device company incorporated in Delaware with its headquarters in Switzerland, and whose common stock traded on the SIX Swiss Exchange. The company's certificate of incorporation included a § 102(b)(7) provision eliminating personal director liability for breaches of the duty of care.

Synthes' board (the "Board") was composed of ten directors, each of whom is a defendant in this action. The most notable of the directors for purposes of this motion is Swiss billionaire Hansjoerg Wyss, the 76–year–old Chairman of the Board and Synthes' alleged controlling stockholder. Mr. Wyss founded Synthes in the 1970s and served as its CEO for thirty years until his retirement in 2007. The plaintiffs [4] allege that Wyss controlled a majority of the board by dominating five other members through a mix of alleged close familial and business ties. [5] The plaintiffs effectively concede the independence of the remaining four directors. In terms of voting control, Wyss owned 38.5% of the

company's stock, making him the company's largest stockholder. [6] The plaintiffs further allege, however, that Wyss controlled approximately 52% of Synthes' shares through his control of 13.25% of the company's shares owned by family members and trusts. [7]

According to the plaintiffs, Wyss was well past retirement age and getting ready at some point to step down as Chairman of the Board from the company he spent many years of his life building. As part of that plan, he wanted to divest his stockholdings in Synthes and free up that wealth in order to achieve certain estate planning and tax goals. [8] Doing so piecemeal would be problematic, however, because unloading that much stock on the public market in blocs would cause the share price to drop, thus reducing his sale profits. [9] So, the plaintiffs contend, in order to achieve his liquidity goals in view of Synthes' allegedly thin public float, Wyss needed to sell his personal holdings to a single buyer. Wyss was by far the largest stockholder of Synthes (with the next largest non-affiliated stockholder holding only a 6% stake [10]), and thus was the only stockholder who could not liquidate his entire

---

3. These are the facts as alleged in the complaint and incorporated documents. The operative pleading for purposes of this motion is the Verified Consolidated Second Amended Class Action Complaint. For the sake of economy, I cite to this complaint simply as if it was the original complaint, and use the abbreviation "Compl." to do so.

4. The plaintiffs in this action are the Norfolk County Retirement System and the Inter–Local Pension Fund of the Graphic Communications Conference of the International Brotherhood of Teamsters.

5. These directors include: (i) Mr. Wyss' daughter, Amy Wyss; (ii) Robert Bland, trustee for certain Wyss family trusts; (iii) Charles Hedgepeth, who supposedly "owes lucrative and prestigious positions to [Wyss], who presided as Synthes CEO during the time

frame that Hedgepeth held his executive positions with the [c]ompany," Compl. ¶ 100; (iv) David Helfet, trustee for a non-profit foundation which allegedly has a close connection with Wyss; (v) and Amin Khoury, who is said to have been Wyss' "right-hand-man" throughout the Merger process, *id.* ¶ 98. No fact allegations are directed towards the remaining four directors aside from those listing their title: Daniel Eicher, Andre Mueller, Felix Pardo, and Jobst Wagner.

6. *Id.* ¶ 48.

7. *Id.*

8. *E.g., id.* ¶¶ 5, 12.

9. *Id.* ¶ 5.

10. *Id.* ¶ 58.

Synthes stake on the public markets without affecting the share price.[11] The plaintiffs contend that this "unique" liquidity dilemma infected the entire sale process ultimately consummated by the Merger.[12]

### B. The Board Embarks On The Merger Process

[1] The idea to find a potential buyer for Synthes arose in April 2010 as part of the Board's ongoing review of the company's strategic initiatives. The complaint alleges that Wyss "supported" the decision to explore a sale transaction, although the complaint does not allege whose idea it was in the first instance.[13] In that regard, it is notable that the complaint itself says that it is "summar[izing]" the Amended Proxy Statement (the "Proxy Statement"), and refers to the Proxy Statement as "attest[ing] to [Wyss'] dominance of the sales process,"[14] when the Proxy Statement clearly states that the impetus of the transaction came from the Board, not Wyss.[15] This pleading approach bears emphasis. The plaintiffs got some written discovery and this is their second amended complaint. But, the complaint relies heavily on the Proxy Statement for its allegations, as it specifically admits,[16] and clearly incorporates that document. Having premised their recitation of the facts squarely on that document and incorporated it, the plaintiffs cannot fairly, even at the pleading stage, try to have the court draw inferences in their favor that contradict that document, unless they *plead* non-conclusory facts contradicting it.[17] Playing games with virtual ellipses is not a way to plead non-conclusory facts.

With that mind, let us return to the story. Following Wyss' approval of the Board's desire to explore strategic alternatives, the Board appointed independent director Amin Khoury as lead director, and it hired Credit Suisse Securities (USA) LLC as its financial advisor.

Belying any crisis need to sell, the complaint indicates that the Board and its financial advisor were deliberate in the marketing of the company. The actual marketing of Synthes did not begin until September 2010, when the Board contacted nine logical strategic buyers with the financial capacity to acquire a company of Synthes' large size, which at the time exceeded $15 billion.[18] Four of these poten-

---

11. *Id.* ¶ 13.

12. *Id.*

13. *Id.* ¶ 65 ("According to the Amended Proxy, the sale-of-the-Company initiative that ultimately led to the [Merger] began to take shape in April 2010, when [Wyss] supported the potential sale of the Company.").

14. *Id.* ¶ 62.

15. *See* Lyons Aff. Ex. A ("Proxy Statement") at 26.

16. *E.g.,* Compl. ¶ 62 (alleging that a "summary" of the Proxy Statement follows); *id.* ¶ 65 (alleging that "[a]ccording to the [Proxy Statement], the sale-of-the-Company initiative that ultimately led to the [Merger] began to take shape in April 2010, when [Wyss] supported the potential sale of the Company.").

17. *See In re BHC Commc'ns S'holder Litig., Inc.,* 789 A.2d 1, 13 (Del.Ch.2001) (stating that the court "need only draw inferences that [it] finds to be both reasonable and supported by the factual allegations of the complaint[ ]," but that it "harbor[ed] serious reservations about the basis for [the] allegations" given the plaintiffs' "highly selective (and near total) reliance on the draft registration statement" in that case, which it found "troubling" given their "slavish copying of large parts of that document," but denying the motion to dismiss because it concluded that the plaintiffs had pled non-conclusory facts rather than assert the existence of inferences to be drawn from the alleged facts that could not be reasonably drawn from the other alleged facts).

18. According to Synthes' 2010 Annual Report, it had a 2010 year-end market capitalization exceeding $15 billion. *See* Synthes, Inc., Annual Report (Form 10–K), at CG2 (Feb. 21, 2011).

tial buyers expressed preliminary interest, although one soon declined to proceed with negotiations. Synthes entered into confidentiality agreements with the three remaining strategics (one of which was J & J) and shared financial due diligence information with them.

J & J is a global manufacturer of healthcare products and provider of related services, and is one of the last few remaining AAA-rated companies in the U.S. With a market capitalization exceeding $167 billion,[19] its common stock is widely held and traded on the NYSE. After reviewing the preliminary due diligence materials, J & J expressed interest in pursuing a deal, and representatives from it and Synthes met on several occasions over the next several months to discuss a potential transaction between the two companies. J & J would be the only strategic buyer to emerge as a bidder.

Although it was engaged in talks with J & J, the Board was also open to pursuing a deal with a financial buyer. So, in mid-November 2010, it authorized Credit Suisse to open a second negotiating front and reach out to six private equity firms that were considered to have the resources necessary to buy Synthes. Four of these firms signed confidentiality agreements and received Synthes' financial due diligence materials.[20] On December 13, 2010, three of the firms submitted separate non-binding proposals to acquire the company at ranges of up to CHF (Swiss Franc) 150 per share in cash. But, the firms indicated that they could not finance an acquisition of Synthes independently and would need to form a consortium in order to proceed with a transaction. After an additional round of meetings in January 2011 at which Wyss was present, Synthes authorized the three firms to club for bidding purposes.[21] In other words, the complaint indicates that the Board, with Wyss' support, gave the three private equity firms a chance to collaborate so as to facilitate their ability to make an attractive all-cash offer as a consortium, that they did not have the capacity to do in isolation.

In the meantime, on December 23, 2010, J & J submitted its first non-binding offer to acquire Synthes at an indicative price range of CHF 145–150 per share, with more than 60% of the consideration to be paid in the form of J & J stock. Wyss allegedly informed J & J that Synthes would review the offer and respond in the coming weeks.[22]

Negotiations also moved forward with the private equity buyers. On February 9, 2011, the newly formed consortium (the "PE Club") submitted a revised bid, reflecting an increased all-cash purchase price of CHF 151 per share (the "Partial Company Bid"). Even as a consortium, however, the PE Club did not have deep enough pockets to make a bid for the whole company. Rather, the proposal "required" Wyss to "convert a *substantial* portion of his equity investment in Synthes into an equity investment in the post-merger company."[23] In other words, the

---

19. This is an approximation based on J & J's closing stock price on September 15, 2010 ($61.05 per share), multiplied by the number of J & J shares outstanding as of October 29, 2010 (2,746,253,692), which equals $167,658,787,896. *See* Yahoo Finance, J & J Historical Stock Prices, http://finance.yahoo.com/q/hp?s=JNJ+Historical+Prices (last visited Aug. 17, 2012); Johnson & Johnson, Quarterly Report (Form 10–Q), at 1 (Nov. 10, 2010).

20. Compl. ¶¶ 69–70.

21. *Id.* ¶ 73.

22. *Id.* ¶ 72.

23. *Id.* ¶ 74 (emphasis added); *see also* Proxy Statement at 27.

Partial Company Bid was contingent on Wyss' financing part of the transaction with his own equity stake in order to lower the acquisition cost of an already expensive purchase, and Wyss remaining as a major investor in Synthes. Although the plaintiffs contend that "there is no indication that the firms labeled this proposal a final offer,"[24] they conveniently omit from their pleading that the Proxy Statement indicates that the PE Club told Synthes that "*[it] could not increase [its] proposal above CHF 151 per share.*"[25] This gamesmanship is unfortunate, given that the plaintiffs have incorporated the Proxy Statement in the complaint and admit that their factual allegations are a "summary" of the Proxy Statement.[26]

Following the receipt of these bids, the Board met with its advisors on February 10 and 11, 2011 to compare the competing proposals in view of its strategic alternatives, such as foregoing a transaction in favor of growing by acquisition, or maintaining the status quo.[27] The Board recognized that the Partial Company Bid represented greater value certainty because it was all cash.[28] In another one-sided characterization of the document they expressly incorporate, however, the plaintiffs omit from their "summary" of the Proxy Statement that the Board also recognized that the Partial Company Bid was riskier because the ability of the PE Club to close the deal would depend on the health of the financing markets.[29] At that meeting, the Board also discussed the Partial Company Bid's requirement that Wyss roll a "substantial portion of his equity" in order to finance a cash buy-out of Synthes.[30] The plaintiffs allege that Wyss was opposed to this aspect of the deal because he wanted to cash out alongside the rest of Synthes' shareholders rather than trade one illiquid bloc of stock (his Synthes shares) for another (shares in the private post-merger entity). In that latter scenario, Wyss, of course, would also have a substantial bloc tied up in a company where he no longer had the same voting clout, and thus would have an illiquid, private company-bloc with no control or exit power. Consistent with his motivation to avoid what could be seen as a down trade in status, Wyss allegedly caused the Board to cease consideration of the Partial Company Bid at that time.[31] The Board then authorized Khoury, as the lead director, to continue discussions with

---

**24.** Pls. Ans. Br. at 10.

**25.** *See* Proxy Statement at 27 (emphasis added).

**26.** Compl. ¶ 62. *See also In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169–70 (Del.2006) (in the context of disclosure claim, noting that the court is not "obligated to accept as true allegations that misstated or mischaracterized the entire [document incorporated into the complaint]" when the plaintiff only quotes "selective and misleading portions" of that incorporated document).

**27.** On February 11, 2011, the exchange ratio between Swiss Francs and U.S. Dollars was 1 USD for 0.9733 CHF. *See* Exchange Rates UK, Full USD–CHF Exchange Rate, *available at* http://www.exchangerates.org.uk/USD-CHF-exchange-rate-history-full.html (last visited Aug. 17, 2012). Given that Synthes had approximately 118.8 million shares outstanding, *see* Compl. Ex. D at 13, the J & J offer of CHF 145–50 implied an average equity value of Synthes of approximately $18 billion. The Partial Company Bid at CHF 151 implied an equity value of $18.4 billion. But, let's assume that a "substantial" part of Wyss' shares meant a 20% stake in Synthes. That means that the PE Club would only have to come up with $14.7 billion to finance the transaction and require Wyss to keep approximately $3.6 billion invested in Synthes.

**28.** Compl. ¶ 8.

**29.** Proxy Statement at 28.

**30.** Compl. ¶ 75.

**31.** *Id.*

J & J exclusively. On February 14, 2011, Khoury spoke with J & J regarding its proposal of CHF 145–150 per share, and proceeded to bid it up. Specifically, Khoury used the Partial Company Bid as leverage to get J & J to sweeten its bid. He informed J & J that Synthes had received all-cash proposals in amounts higher than CHF 150 per share, and so J & J's offer was unacceptable, and that it would only accept a proposal at CHF 160 per share.[32]

Two days later, J & J came back and raised its offer to CHF 155 per share in stock and cash, and displayed a willingness to bid more than that pending the outcome of its due diligence review. Over the next several months, the parties and their advisors met numerous times in connection with their due diligence reviews, which Synthes undertook in light of the stock component of the proposed deal.

Also during this time, the parties negotiated the "Merger Agreement," the terms of which were finalized on April 24, 2011. Notably, J & J agreed to increase its offer to CHF 159 per share, with a consideration mix of 65% stock (subject to a collar) and 35% cash.[33] All stockholders, including Wyss, would receive the same per share Merger consideration. There are no allegations that Wyss tried to negotiate a higher price for his own shares. Also, under Swiss tax law, Swiss-resident stockholders (including Wyss) would receive a tax-free capital gain on the stock portion of the Merger consideration,[34] because it appears that under Swiss tax law individual taxpayers are not taxed on capital gains resulting from the sale of stock.[35] This extra-favorable tax treatment does not apply to U.S. taxpayers. Rather, under U.S. tax law, the Merger was a taxable transaction and so Synthes stockholders residing in the United States would be forced to recognize for tax purposes the capital gain

32. *Id.* ¶ 76.

33. *See* Proxy Statement at 30 (describing Merger Agreement). On April 24, 2011, the exchange rate between the dollar and the Swiss Franc was 1 USD for 0.886 CHF. On that date, the difference in the equity value implied by J & J's bid of CHF 155 per share to CHF 159 per share was equal to approximately $536 million, and the difference from J & J's initial bid of CHF 145–150 per share to CHF 159 per share was approximately $1.5 billion. Also, the difference in the implied equity value for the whole entity between the Partial Company Bid at CHF 151 and the Merger at CHF 159 was, on that date, approximately $1.07 billion.

34. *E.g.*, Compl. ¶ 58(b); Proxy Statement at 57 ("Swiss-resident individual taxpayers holding Synthes common stock as their private property should realize a tax-free private capital gain or a non-tax-deductible loss, as the case may be, for Swiss federal, cantonal and municipal income tax purposes with respect to all or part of the shares of Johnson & Johnson common stock received in the merger.").

35. *See* Deloitte International Tax, *Switzerland Highlights* 3 (2012), *available at* http://www.deloitte.com/assets/Dcom–Global/Local%20Assets/Documents/Tax/Taxation%20and%20Investment%20Guides/2012/dttl_tax_highlight_2012_Switzerland.pdf (noting that "[g]ains realized on the sale of shares ... generally are not subject to federal tax" under Swiss tax law for individual taxpayers). But, the Proxy indicates that the cash portion of the Merger consideration "may be treated as taxable income for Swiss federal, cantonal and municipal income tax purposes." Proxy Statement at 57. Later SEC filings made by J & J and Synthes before the closing of the Merger indicate that this is because the cash portion might be treated as "dividend income" under Swiss tax law, but that "[b]ased on the current financing structure and current exchange rates, [they] expect that no such portion of the merger consideration should be treated as dividend income for those Swiss-resident taxpayers." Johnson & Johnson, Current Report (Form 8–K), Ex. 99.1 at 3 (June 12, 2012).

associated with all of the Merger consideration, including the stock component.[36]

J & J required certain deal protections as part of the Merger. First, J & J required that Wyss, along with his daughter (who was also a director) and two Wyss family trusts, enter into a voting agreement binding them to collectively vote approximately 37% of Synthes' outstanding stock in favor of the Merger (the "Voting Agreement"), which was less than the 48.83% that they held collectively.[37] Second, the Board agreed to a no-solicitation provision but retained a fiduciary out to consider a superior proposal. Third, the Board agreed to hold a stockholder vote on the Merger regardless of whether the Board exercised its fiduciary out and changed its recommendation in favor of a superior proposal.[38] In that event, however, the percentage of shares subject to the Voting Agreement would be reduced from approximately 37% to 33%. Fourth, the Board agreed to certain matching rights, allowing J & J five business days to match a superior proposal and two days to match an amendment to a superior proposal. Fifth, the Board agreed to a termination fee of $650 million, which represented approximately 3.05% of the equity value of the Merger at the time of signing, and an even lower percentage of enterprise value (approximately 2.9%),[39] which is typically the more relevant measure for assessing the preclusive effect of a termination fee on a materially better topping bid.[40]

By this time, it had been almost three months since the PE Club had submitted its Partial Company Bid for Synthes at CHF 151. There is no allegation that the PE Club came forward with a higher expression of interest for even the part they were purporting to buy, much less a whole company bid.

On April 25, the boards of both companies separately met to review the Merger. At the Synthes board meeting, Credit Suisse opined that the Merger was fair from a financial perspective to the holders of Synthes common stock, and the Board approved the Merger Agreement and recommended that stockholders vote in favor of it.

The next day, Synthes and J & J entered into the Merger Agreement and Voting Agreement, which was publicly announced. As of the date of the Merger Agreement, the Merger implied an equity value of $21.3 billion,[41] representing a 26% premium to Synthes' average trading price during the month preceding the announcement.[42] On December 15, 2011, the Synthes stockholders voted to approve the Merger at a special stockholder meeting that took place in Switzerland. Between the time that the Merger Agreement was announced on April 26, 2011, and the vote

---

**36.** Compl. ¶ 58(b); Proxy Statement at 56.

**37.** Compl. ¶ 49. An *Omnicare* move, no doubt. *See Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 936 (Del.2003).

**38.** *See* 8 *Del. C.* § 251(c).

**39.** The calculation of enterprise value is a rough approximation based on the equity value implied by the Merger plus Synthes' total liabilities of approximately $1.18 billion less cash and cash equivalents of approximately $736 million as of 2010. *See* Synthes, Inc., Annual Report (10-K), at FR4-5 (Feb. 21, 2011) (Consolidated Balance Sheets).

**40.** *See In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 120 (Del.Ch.2007) (noting that the enterprise value metric is arguably more instructive than the equity value metric for assessing the preclusive effect of a termination fee because "most acquisitions require the buyer to pay for the company's equity and refinance all of its debt").

**41.** *See* Johnson & Johnson, Current Report (Form 8–K), Ex. 9 (Apr. 27, 2011).

**42.** Compl. ¶ 86.

nearly eight months later, neither the PE Club nor any other bidders made a topping overture.

After a lengthy period of regulatory review, the parties obtained the necessary antitrust approvals by June 11, 2012. And so, on June 14, 2012, the Merger closed—more than one year after the Merger Agreement was signed, and more than two years after the Board first began exploring a potential sale transaction.

### III. The Parties' Contentions On This Motion

The plaintiffs challenge the fairness of the Merger to the Synthes stockholders unaffiliated with Wyss on three alternative, but related, grounds. Primarily, they allege that the Merger with J & J was a conflicted transaction that should be subject to review under the entire fairness standard of review. They allege that Wyss was Synthes' controlling stockholder and breached his fiduciary duties by supposedly unfairly preventing the Synthes Board from pursuing the Partial Company Bid, which at the time presented the highest-value and greatest-certainty proposal for Synthes' minority stockholders.[43] Specifically, the plaintiffs contend that Wyss had financial motives adverse to the best interests of the Synthes stockholders because he was supposedly anxious to sell his portion in Synthes rapidly, and thus to sell the company as a whole to facilitate his own exit. Relatedly, Wyss was conflicted because he was only willing to accept a deal that delivered for him the liquidity he wanted for his shares in accordance with his retirement objectives. The Merger

met those objectives because it offered him two forms of liquid currency (J & J stock and cash).[44] But, when a potential deal surfaced that did not meet these criteria, he refused to consider it, even though it might have been a better one for the rest of Synthes' stockholders. Because of that failing, he allegedly disregarded their best interests, and instead secured a deal that advanced his personal agenda. And, because the Board allegedly deferred to Wyss' demand to abandon the bidding war in favor of J & J—Wyss' preferred buyer—the individual directors are supposedly liable for breach of the fiduciary duty of loyalty because they too subordinated the best interests of Synthes' stockholders by acceding to Wyss' needs and refusing to proceed with further consideration of the Partial Company Bid.[45]

In addition to their core argument that Wyss had conflicting interests that justify invocation of the entire fairness standard, the plaintiffs also contend that the Merger was at the very least subject to enhanced scrutiny under *Revlon*[46] because they argue that the Merger was an "end stage"[47] transaction that represented the last opportunity for Synthes stockholders to receive a control premium for their shares.[48] The plaintiffs claim to have pled facts that support a claim that the directors on the Board breached their non-exculpated fiduciary duties by failing to fulfill their duty under *Revlon* to take reasonable steps to obtain the highest value reasonably attainable for Synthes. Finally, the plaintiffs also contend that Wyss and his fellow directors breached their fiduciary duties under *Unocal*[49] by agreeing to unreasonable

---

**43.** *See* Compl. ¶ 47; Pls. Ans. Br. at 3–4.

**44.** *See* Compl. ¶¶ 12–13.

**45.** *Id.* ¶ 102.

**46.** *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986).

**47.** Compl. ¶ 95.

**48.** *See* Pls. Ans. Br. at 52.

**49.** *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985).

deal protections that precluded more attractive bids.[50]

The defendants move to dismiss. They argue that there is no basis to invoke the entire fairness standard of review because Wyss, even if he was a controlling stockholder, did not have a disabling conflict of interest that renders the business judgment rule inapplicable. Rather, the defendants stress that Wyss received the same consideration in the deal as all the other Synthes stockholders. Moreover, they note that Wyss was ideally suited to bargain hard for the rest of Synthes' stockholders, because even if he wanted liquidity—which the defendants say he was entitled to want as a selling stockholder—he had a huge incentive to seek liquidity at the best price for all stockholders and thus had no incentive to accept an unattractive bid. The defendants also argue that *Revlon* review does not apply because the Merger is not a change of control transaction under *In re Santa Fe Pacific Corp. Shareholder Litigation*,[51] given that 65% of the Merger consideration was paid in J & J stock, and J & J is held broadly by the market. Indeed, they argue that this is an ill-fitting case for *Revlon* review because the Synthes stockholders went from holding stock in an allegedly controlled company to one where control is held broadly in the market. Finally, they stress that the plaintiffs' *Revlon* and *Unocal* arguments are devoid of even pleading-stage vitality because the Merger resulted from a lengthy sale process involving solicitation of all logical buyers, patient negotiations to raise the ultimate winner's bid, and the use of deal protections that were of a standard nature and that were afforded only after an open, front-end process that gave many buyers a chance to purchase Synthes without confronting any deal protection barriers.

## IV. *Legal Analysis*

### A. *The Procedural Standards Applicable To A Motion To Dismiss Under Rule 12(b)(6)*

In considering a motion to dismiss under Court of Chancery Rule 12(b)(6), I must accept all well-pled allegations of specific facts as true and draw all reasonable inferences in favor of the plaintiff.[52] I may only grant the motion if the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[53] But, importantly, I am only required to accept those reasonable inferences that flow "logically" from the non-conclusory facts pled in the complaint, and I am not required to accept "every strained interpretation of the allegations proposed by the plaintiff."[54] Because the directors on the Board are protected by the § 102(b)(7) provision exculpating them for personal liability stemming from a breach of the duty of care, the complaint must be dismissed against the directors unless the plaintiffs have successfully pled non-exculpated claims for breach of the duty of loyalty against them.[55]

---

**50.** *See* Compl. ¶¶ 103–15.

**51.** 669 A.2d 59 (Del.1995).

**52.** *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del.2006).

**53.** *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

**54.** *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del.2001).

**55.** *See id.* at 1092.

## B. The Business Judgment Rule Applies To A Merger Resulting From An Open And Deliberative Sale Process When A Controlling Stockholder Shares The Control Premium Ratably With The Minority

A core tenet of Delaware corporate law is that the directors of a corporation are presumed to have acted "independently, with due care, in good faith and in the honest belief that [their] actions were in the stockholders' best interests."[56] The burden is on the plaintiff challenging the corporate decision to allege facts that rebut the presumption that a board's decision is entitled to the protection of the business judgment rule.[57] One traditional way of doing so, of course, is for a plaintiff to allege that the merger transaction she challenges was an interested one in which the corporation was on the other side from its majority stockholder.[58] When a merger transaction is with a third party, however, plaintiffs have sought to invoke the entire fairness standard by arguing that the controlling stockholder received materially different terms from the third party in the merger than the minority stockholders and that the third-party merger should therefore be subject to fairness review irrespective of the fact that the controlling stockholder was not on both sides of the table.[59] The argument in that context is that the controller used its power over the company to cause the company to enter into a transaction that was not equal to all the stockholders, and unfair to the minority because the controller unfairly diverted proceeds that should have been shared ratably with all stockholders to itself.[60]

In this case, a chutzpah version of that theory is advanced. That theory involves the notion that if a controlling stockholder like Wyss has a liquidity issue not shared by small stockholders and does not wish to continue to be a stockholder in the selling corporation, and expresses its desire for a transaction that affords it the same liquidi-

---

56. *Williams v. Geier*, 671 A.2d 1368, 1376 (Del.1996).

57. *Cede Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del.1993).

58. *E.g., Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del.1994); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del.1983); *see also Cede*, 634 A.2d at 362 (referring to a "classic self-dealing transaction" as one "where a director or directors stand on both sides of a transaction").

59. *E.g., In re BHC Commc'ns S'holder Litig., Inc.*, 789 A.2d 1, 11 (Del.Ch.2001) (loyalty claim against controlling stockholder ordinarily requires "well-pleaded allegations that it had an interest in the transaction that differed from that of the other stockholders and exercised its control over the approval of the transaction.").

60. *See In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009) (applying entire fairness where the controlling stockholder received different consideration from the minority and thus was "in a sense 'competing' for portions of the consideration [the acquiror] was willing to pay ... and [the controller] could effectively veto any transaction"); *In re LNR Prop. Corp. S'holders Litig.*, 896 A.2d 169, 178 (Del. Ch.2005) (denying motion to dismiss where the pled fact that the controlling stockholder acquired a "substantial stake" in the resulting company and thus took a different form of consideration from the rest of the stockholders, who were cashed out, supported a reasonable inference that the controlling stockholder was "sufficiently conflicted at the time he negotiated the sale that he would rationally agree to a lower sale price in order to secure a greater profit from his investment in the [resulting entity]"); *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 689 & n. 9 (Del.Ch.1996), (applying entire fairness when the controlling stockholder "received a $2 million benefit that was not shared with the minority shareholders in the Asset Sale," thus diverting from the minority the benefits that would have been paid to it had the acquiror paid that $2 million as part of the purchase price for the company), *aff'd*, 693 A.2d 1082 (Del.1997).

ty and ability to sell out as all the other stockholders get, the controlling stockholder nonetheless has a disabling conflict if it refuses to assent to an alternative proposal on terms that afford all of these benefits to the minority, but not to itself, even if the ultimate transaction that is agreed to shares the control premium ratably between the controller and the other stockholders. By the same theory, the independent directors who assented to the transaction that treated all stockholders equally and that gave the minority its full pro rata share of the control premium have supposedly violated the duty of loyalty by subordinating the best interests of the minority to the outrageous demand of the controller for equal treatment. Their support of the pro rata Merger supposedly evidenced their "domination and control" by the controller.[61] In the coming pages, I address this aggressive argument and explain why I do not believe it is consistent with our settled law.

■ For purposes of that analysis, I accept the plaintiffs' contention that Wyss was Synthes' controlling stockholder, and that he was actively involved in helping the Board negotiate the terms of the Merger.[62] I thus focus my analysis on whether Wyss had any conflicting interest in the Merger that would justify depriving the Board of the protections of the business judgment rule and instead subjecting its decision to approve the Merger to entire fairness review. Under venerable and sound authority, the plaintiffs must plead that Wyss had a conflicting interest in the Merger in the sense that he derived a personal financial benefit "to the exclusion of, and detriment to, the minority stockholders."[63] The plaintiffs unconvincingly try to gin up a conflict of interest by asserting that Wyss received liquidity benefits that were not shared equally with the rest of the stockholders and colored his decision to support the Merger and to supposedly improperly reject further consideration of the Partial Company Bid. I address these arguments in turn.

### C. Does A Controller's Desire For the Same Liquidity As Other Stockholders Amount To A Conflicting Interest?

■ The major argument that the plaintiffs make is that Wyss was a really rich dude who wanted to turn the substantial wealth he had tied up in Synthes into liquid form—and fast. Because he had such an enormous investment in Synthes, Wyss could not easily wind out of his position without a sizable transaction: either a sale of his own bloc as a whole (which can be problematic to buyers for all kinds of reasons), or, more easily, through a sale of all of Synthes' equity in a merger. The complaint hints that as Wyss aged, he was anxious to get out of Synthes and that

61. See Aronson v. Lewis, 473 A.2d 805, 816 (Del.1984).

62. In order to demonstrate that Wyss was a controlling stockholder, the plaintiffs must plead facts that, if true, would demonstrate that Wyss owned more than 50% of Synthes' voting power, or exercised control over its business and affairs. See Citron v. Fairchild Camera & Instrument Corp., 569 A.2d 53, 70 (Del.1989).

63. Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del.1971); see also Goodwin v. Live Entm't, Inc., 1999 WL 64265, at *27 (Del.Ch.

Jan. 25, 1999) ("Pioneer simply did not stand on both sides of this merger. As a consequence, Goodwin has to show that Pioneer had some other material self-interest in the merger ...."), aff'd, 741 A.2d 16 (Del.1999); 1 David A. Drexler et al., Delaware Corporate Law and Practice § 15.11, at 15–95 (2009) (explaining in the analogous parent-subsidiary context that, to invoke entire fairness review, "[a] minority stockholder must first present a prima facie showing that the transaction involved self-dealing in that it created a special benefit for the parent and caused an apparent detriment to the subsidiary.").

this anxiety drove the strategic process of the company in a way that was unfair to the minority, because Wyss somehow denied them access to fair value.

As shall be seen, the plaintiffs advance a series of these "liquidity-based" theories regarding Wyss' supposed conflicts, from which they have retreated in part. But, their brief advances versions of all three and I address them all. The first is based on the premise that Wyss was an impatient capitalist looking to sell out fast and thus willing to take a less than fair market value for Synthes, if that got in the way of a hasty exit.

■ If ever there be a case to indulge the unusual and counterintuitive notion that a controlling stockholder has a conflict because the controller supported a board's desire to consider strategic options and its ultimate negotiation of a merger that provides equal consideration to all stockholders, this is not that case. Generally speaking, a fiduciary's financial interest in a transaction as a stockholder (such as receiving liquidity value for her shares) does not establish a disabling conflict of interest when the transaction treats all stockholders equally, as does the Merger.[64] This notion stems from the basic understanding that when a stockholder who is also a fiduciary receives the same consideration for her shares as the rest of the shareholders, their interests are aligned.[65] It also stems from the desire of the common law of corporations to make common sense. Controlling stockholders typically are well-suited to help the board extract a good deal on behalf of the other stockholders because they usually have the largest financial stake in the transaction and thus have a natural incentive to obtain the best price for their shares.[66] As a general matter, therefore, if one wishes to protect minority stockholders, there is a good deal of utility to making sure that when controlling stockholders afford the minority pro rata treatment, they know that they have docked within the safe harbor created by the business judgment rule. If, however, controlling stockholders are subject to entire fairness review when they share the premium ratably with everyone else, they

**64.** See *In re Anderson, Clayton S'holders Litig.*, 519 A.2d 680, 687 (Del.Ch.1986); *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 755133, at *7 (Del.Ch. June 26, 2001) (finding no improper benefit when "[t]here [was] no allegation that any of the remaining directors obtained any improper benefit whatsoever from the merger other than from their entitlement, as shareholders, to receive the merger consideration," and the directors "received the merger consideration on the same terms as any other shareholder").

**65.** See *In re CompuCom Sys., Inc. S'holders Litig.*, 2005 WL 2481325, at *6 (Del.Ch. Sept. 29, 2005) ("[A]s the owner of a majority share, the controlling shareholder's interest in maximizing value is directly aligned with that of the minority.").

**66.** See *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *27 (Del.Ch. Jan. 25, 1999) (expressing principle that a controlling stockholder has a "natural desire to obtain the best price for its shares"), *aff'd*, 741 A.2d 16 (Del.

1999); *accord* Ronald J. Gilson & Jeffrey N. Gordon, *Controlling Controlling Shareholders*, 152 U. Pa. L.Rev. 785, 815 n. 115 (2002) (acknowledging this incentive). By contrast, the plaintiffs indicated at oral argument that they collectively owned approximately 100,000 Synthes shares. If that is the case, then their percentage ownership of Synthes nears 0.08%, as compared to Wyss' personal holdings of more than 38%. The holding periods of typical active institutional investors for specific equity positions are now often shorter than the time from when Synthes starting selecting buyers in September 2010 to when its stockholders approved the Merger in December 2011. For these statistics, see sources cited in Leo E. Strine, Jr., *One Fundamental Corporate Governance Question We Face: Can Corporations Be Managed For The Long Term Unless Their Powerful Electorates Also Act And Think Long Term?*, 66 Bus. Law. 1, 10–11 n. 30–36 (2010).

might as well seek to obtain a differential premium for themselves or just to sell their control bloc, and leave the minority stuck-in. How this incentive scheme would benefit minority stockholders more than a system creating an incentive for pro rata treatment is something the plaintiffs have not explained, and my limited mind cannot conjure why it would.

It may be that there are very narrow circumstances in which a controlling stockholder's immediate need for liquidity could constitute a disabling conflict of interest irrespective of pro rata treatment. Those circumstances would have to involve a crisis, fire sale where the controller, in order to satisfy an exigent need (such as a margin call or default in a larger investment) agreed to a sale of the corporation without any effort to make logical buyers aware of the chance to sell, give them a chance to do due diligence, and to raise the financing necessary to make a bid that would reflect the genuine fair market value of the corporation. In those circumstances, I suppose it could be said that the controller forced a sale of the entity at below fair market value in order to meet its own idiosyncratic need for immediate cash, and therefore deprived the minority stockholders of the share of value they should have received had the corporation been properly marketed in order to generate a bona fide full value bid, which reflected its actual market value.[67] The world is diverse enough that it is conceivable that a mogul who needed to address an urgent debt situation at one of his coolest companies (say a sports team or entertainment or fashion business),

would sell a smaller, less sexy, but fully solvent and healthy company in a finger snap (say two months) at 75% of what could be achieved if the company sought out a wider variety of possible buyers, gave them time to digest non-public information, and put together financing. In that circumstance, the controller's personal need for immediate cash to salvage control over the financial tool that allows him to hang with stud athletes, supermodels, hip hop gods, and other pop culture icons, would have been allowed to drive corporate policy at the healthy, boring company and to have it be sold at a price less than fair market value, subjecting the minority to unfairness.

That sort of uncommon scenario, however, has no application here. Specifically, there are no well-pled facts to suggest that Wyss forced a crisis sale of Synthes to J & J in order to satisfy some urgent need for cash. By the plaintiffs' own admission, Wyss was loaded. They plead no facts suggesting that he faced a solvency issue, or even the need to buy something other than a Ferrari or Lamborghini when he purchased his next vehicle.

Likewise, the complaint is devoid of allegations suggesting that Wyss was in any particular rush to sell his Synthes shares. There are no pled facts that he tried to sell his stock in whole or in substantial part at any time after stepping down as CEO in 2007, as one would expect if he was anxious to liquidate his holdings, or that he initiated the process that ultimately led to the Merger, as one would expect if he

---

67. *See N.J. Carpenters Pension Fund v. Infogroup, Inc.*, 2011 WL 4825888, at *4, *9–10 (Del.Ch. Sept. 30, 2011) (denying motion to dismiss because the plaintiff sufficiently alleged a material conflict of interest where the plaintiff alleged that the director, who was also a large stockholder, was in desperate need of liquidity to (i) satisfy personal judgments and repay loans that in total exceeded $25 million and (ii) fund a new venture, in conjunction with allegations that (iii) the director had been fired from his job, (iv) had no other discernable sources of cash inflow or other liquid assets, and that (v) the director threatened fellow board members with lawsuits if they did not take action to sell the company).

wanted to time the transaction in a way that was beneficial to him. In fact, the Proxy Statement, which the complaint says that it is "summar[izing]," [68] says that the Board, and not Wyss, initiated the idea for conducting a look at strategic alternatives.

The plaintiffs' argument that Wyss had somehow become an impatient capitalist is therefore strikingly devoid of pled facts to support it. Wyss had been Synthes' CEO for thirty years, and stayed on as chairman of the board for five years after that. No pled facts in the complaint support a basis for conceiving that Wyss wanted or needed to get out of Synthes at any price, as opposed to having billions of reasons to make sure that when he exited, he did so at full value. [69]

The plaintiffs' argument about Wyss' interests also runs into the pled facts about the strategic process in which Synthes engaged. Not only was that process one suggested by the Board and not Wyss, the pled facts indicate that it was a patient process reasonably calculated to generate the highest value the market would pay for Synthes. Contrary to Synthes rushing into the arms of any particular buyer fast, Synthes took its time, gave bidders access to non-public information, and the chance to consider the risks of making a bid and to raise financing for a bid. [70]

That sale effort also did not discriminate against any class of buyers. Logical strategic buyers with wallets large enough to plausibly purchase Synthes were approached. So were the private equity buy-ers in that category. Marketing began in September 2010 and the written Merger Agreement with J & J was not signed until April 26, 2011—some seven months later. Terms with J & J were not reached for several weeks while Synthes, despite knowing that J & J had no rival willing to pay a price equal to what J & J had offered, negotiated to get more. Even then, the deal protections were, by traditional standards, not of a size that would have prevented a serious topping bid by a genuine, motivated interloper. In that regard, if a bidder were willing to pay materially more, the time period between the announcement of the Merger Agreement (April 26, 2011) and the stockholder vote (December 15, 2011) made the possibility of a post-signing jumping bid even more viable.

■ At oral argument, the plaintiffs confronted these realities and conceded that they did not plead facts supporting a rational inference that any desire Wyss had to liquidate his Synthes control position as a matter of responsible estate planning translated into a willingness to do so in any commercially unreasonable time frame such that he would compromise the value of his holdings by engaging in a fire sale of the company. [71]

Therefore, at oral argument, the plaintiffs sought to make clear that their loyalty claim was not premised on any notion that Wyss was in a rush to get a deal done and thereby compromised Synthes' sharehold-

**68.** Compl. ¶ 62.

**69.** *See id.* ¶ 20.

**70.** *See CompuCom*, 2005 WL 2481325, at *10 (rejecting plaintiff's contention that the controller "improperly forced an immediate sale" of the company at a " 'fire sale price' because of its desperate need for cash" when the "process of finding a suitable transaction dragged on for more than two years"); *Van de Walle v.*

*Unimation, Inc.*, 1991 WL 29303, at *11 (Del. Ch. Mar. 7, 1991) (rejecting notion that controlling shareholder was in acute financial distress such that it suffered a disabling conflict of interest when defendants' conduct throughout an eight-month market search and negotiations established that it was motivated to obtain the best possible transaction for all stockholders).

**71.** *See* Tr. 31.

er value in that way. Rather, they argued that Wyss was conflicted because no matter when a deal occurred, Wyss would only accept one in which he received liquidity for his shares and unfairly blocked the Partial Company Bid that required him to remain as an investor in Synthes. The plaintiffs say that they were unfairly deprived of the chance to sell all of their Synthes shares for cash because Wyss refused to support a deal where he did not get to sell all his shares, but had to remain a substantial investor in Synthes.[72] That is, according to the plaintiffs, Wyss breached his fiduciary duties by favoring the Merger "[d]espite its inferior value" over the Partial Company Bid because of the Partial Company Bid's equity roll requirement, thereby "pitting ... [his] interest in structuring his retirement" against the "public shareholders' interest in maximizing their share value." [73]

There are several fundamental problems with this argument. For starters, the plaintiffs conceded at oral argument that *they also wanted liquidity for their shares.*[74] That is, as between a potential deal offering illiquid consideration versus one offering liquid consideration, the plaintiffs wanted the latter. In that way, Wyss' interests were precisely aligned with the plaintiffs' in terms of seeking the best deal.[75] This means that Wyss' supposed liquidity conflict was not really a conflict at all because he and the minority stockholders wanted the same thing: liquid currency and, all things being equal, at the highest dollar value amount of that currency. If there is anything even more liquid than J & J stock, it's cash. Thus, *on the plaintiffs' own theory,* Wyss had little reason not to prefer an all-cash deal if the PE Club was willing to out-bid J & J on terms equally available to all shareholders.[76] In this respect, it is telling that the complaint pleads that Synthes, with Wyss' support, allowed the three private equity buyers to club to facilitate their ability to make an improved cash bid for Synthes.[77] In other words, the complaint does not support a rational inference that Wyss had an aversion to any form of consideration so long as it was liquid and the amount of that consideration was adequate, and that he supported measures to facilitate a favorable private equity cash bid.

The plaintiffs also, as I shall discuss, argue that this case is one that, if not governed by the entire fairness standard, is subject to *Revlon v. MacAndrews &*

---

72. Tr. 31.

73. Pls. Ans. Br. at 3–4.

74. *E.g.,* Tr. 32 ("Certainly, our clients wanted liquidity,"); *id.* (conceding that the plaintiffs would sell their shares in a "nanosecond"); *id.* at 54–55 ("I'm assuming [our clients] would prefer the value certainty of cash, of an all-cash deal ...").

75. *See In re BHC Commc'ns S'holder Litig., Inc.,* 789 A.2d 1, 11 (Del.Ch.2001) (stating that a claim for breach of duty loyalty is ordinarily not supported when there are no well-pled allegations that the controller had an interest in a transaction that differed from that of the other stockholders); *In re RJR Nabisco, Inc. S'holders Litig.,* 1989 WL 7036, at *14 (Del.Ch. Jan. 31, 1989) ("Here, there is no allegation that the members of the Special Committee had any direct financial interest in the sale of the Company to KKR that was adverse to or even differed from the interests of all of the stockholders of the Company.").

76. *Compare In re LNR Prop. Corp. S'holders Litig.,* 896 A.2d 169, 178 (Del.Ch.2005) (denying motion to dismiss when the controlling shareholder retained an equity stake in the surviving entity and thus the court could reasonably infer that the controlling shareholder "was sufficiently conflicted at the time he negotiated the sale that he would rationally agree to a lower sale price in order to secure a greater profit from his investment in the [surviving entity]").

77. *E.g.,* Compl. ¶ 73.

*Forbes Holdings, Inc.*[78] *Revlon* is centered on the notion that when a board engages in a change of control transaction, the board should try to get the highest immediate value reasonably attainable.[79] The immediate value of something turns on the price at which it can be factored in cold hard cash: Americans understand this. For a controlling stockholder to expect that he, like other stockholders, will receive liquid consideration from the buyer creates no disabling conflict of interest, it reflects the shared interests all rational sellers have in obtaining liquid consideration.

Instead, what is revealed is that the plaintiffs' main gripe is that Wyss refused to consider an all-cash offer that might have delivered a better deal for the minority shareholders *at Wyss' expense.* In other words, they complain that Wyss refused to facilitate a potentially better deal for the minority because he was not willing to roll a "substantial" part of his equity stake into the post-merger entity and thereby accept a different, less liquid, and less value-certain form of consideration than that offered to the minority stockholders.[80] That is an astonishing argument that reflects a misguided view of the duties of a controlling stockholder under Delaware law.

A primary focus of our corporate jurisprudence has been ensuring that controlling stockholders do not use the corporate machinery to unfairly advantage themselves at the expense of the minority.[81] It is, of course, true that controlling stockholders are putatively free under our law to sell their own bloc for a premium or even to take a different premium in a merger.[82] As a practical matter, however, that right is limited in other ways that tend to promote equal treatment, for example, by the appraisal remedy that requires pro rata treatment of

**78.** 506 A.2d 173 (Del.1986).

**79.** *See Paramount Commc'ns Inc. v. QVC Network Inc.,* 637 A.2d 34, 44 (Del.1994).

**80.** The defendants rightly point out that if Wyss had done this, the plaintiffs likely would have sued him anyway on the grounds that he was uniquely allowed to roll some of his equity into the new private-equity-controlled Synthes, a company with good growth prospects, and that the minority stockholders were not. That is a more plausible argument than the current one, as in that scenario Wyss would have gotten a different deal from the other stockholders. Here, he got the same deal.

**81.** *See Getty Oil Co. v. Skelly Oil Co.,* 267 A.2d 883, 887 (Del.1970) ("A basic ground for judicial interference with business judgment on the complaint of minority interests is an advantage obtained by the dominant group to the disadvantage of the corporation or its minority owners."); *Thorpe v. CERBCO, Inc.,* 1993 WL 443406, at *7 (Del.Ch. Oct. 29, 1993) (recognizing principle that "a controlling shareholder may not utilize his control to

deprive minority shareholders of the value of their stock."); *see also Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del.1983) (expressing that under principles of Delaware law a fiduciary must "not only affirmatively ... protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation.") (citation omitted); *cf. Guth v. Loft, Inc.,* 5 A.2d 503, 510 (1939) ("Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.").

**82.** *See Mendel v. Carroll,* 651 A.2d 297, 305 (Del.Ch.1994) ("The law has acknowledged, albeit in a guarded and complex way, the legitimacy of the acceptance by controlling shareholders of a control premium."); *In re BHC Commc'ns S'holder Litig., Inc.,* 789 A.2d 1, 11 (Del.Ch.2001) (noting that "the mere fact that Chris–Chraft's stockholders are to receive merger consideration reflecting a control premium not shared with stockholders of BHC and UTV does not support an inference of breach of fiduciary duty."); *see generally* Einer Elhauge, *The Triggering Function of Sale of Control Doctrine,* 59 U. Chi. L.Rev. 1465 (1992).

minority stockholders without regard to minority discounts,[83] by certain substantive and procedural doctrines,[84] and, in a good illustration of the law of unintended consequences, § 203 of the DGCL. These realities not only make it riskier for a controller to seek a premium but limit buyers' willingness to pay one. Particularly in the context of third-party transactions, the effect of these factors is to encourage majority stockholders to use their negotiating power in a way that gives the minority stockholders the opportunity to share in the benefits the majority stockholder obtains for itself.

Thus, when a controlling stockholder acts in accordance with those incentives and shares its control premium evenly with the minority stockholders, courts typically view that as a "powerfu[l]" indication "that the price received was fair."[85]

Delaware law does not, however, go further than that and impose on controlling stockholders a duty to engage in self-sacrifice for the benefit of minority shareholders.[86] That is, the duty to put the "best interest of the corporation and its shareholders" above "any interest ... not shared by the stockholders generally"[87] does not mean that the controller has to

**83.** *See Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144–45 (Del.1989); *cf. Odyssey P'rs, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 406 (Del.Ch.1999) (noting that "general principles of our law disfavor[ ] non-prorata distributions of corporate assets.").

**84.** *See Mendel*, 651 A.2d at 305 (citing doctrines of negligence, sale of corporate office, and sale of corporate opportunity); *see also In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 (Del.Ch. Oct. 2, 2009) (concluding that the plaintiffs invoked entire fairness review when the evidence suggested that the controlling stockholder was effectively "competing" with the minority for portions of the consideration that the acquiror was willing to pay).

**85.** *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del.Ch.1994), *aff'd*, 663 A.2d 1156 (Del.1995); *see also Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del.1989) (rejecting claim that representative of large stockholder on board was "interested" in the merger where there was "not a scintilla of evidence" that the director sought "more favorable terms for a buy-out of its shares than the shares of the remaining ... shareholders"); *In re CompuCom Sys., Inc. S'holders Litig.*, 2005 WL 2481325, at *10 (Del.Ch. Sept. 29, 2005) (business judgment rule not rebutted when "the complaint [did not] allege that [the controlling stockholder] or any other holder of CompuCom's common stock received different consideration for its shares in the merger"); *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *23

(Del.Ch. Jan. 25, 1999) (the "fact that [the controlling stockholder] accepted the same per share consideration for its common stock as the other stockholders" would be "strong evidence of the reasonableness of the Board's decision"), *aff'd*, 741 A.2d 16 (Del.1999); *Yanow v. Scientific Leasing, Inc.*, 1988 WL 8772, at *5 (Del.Ch. Feb. 8, 1988) (fact that single largest stockholder accepted the same consideration for their shares as paid to the remaining stockholders constitutes "prima facie evidence that the offering price is fair") (emphasis omitted).

**86.** *See Getty Oil*, 267 A.2d at 888 ("[T]he duty [of a parent to its subsidiary] does not require self-sacrifice from the parent."); *Odyssey P'rs*, 735 A.2d at 411 (controlling stockholder was under no fiduciary obligation to agree to a proposal that would have "required significant and disproportionate self-sacrifice"); *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del.Ch.1986) ("While the law requires that corporate fiduciaries observe high standards of fidelity and, when self-dealing is involved, places upon them the burden of demonstrating the intrinsic fairness of transactions they authorize, *the law does not require more than fairness*. Specifically, it does not, absent a showing of culpability, require that directors or controlling shareholders sacrifice their own financial interest in the enterprise for the sake of the corporation or its minority shareholders.") (emphasis added).

**87.** *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del.1993).

subrogate his own interests so that the minority stockholders can get the deal that they want.[88] As Chancellor Allen aptly wrote in *Thorpe v. CERBCO, Inc.*, "[c]ontrolling shareholders, while not allowed to use their control over corporate property or processes to exploit the minority, are not required to act altruistically towards them." [89] Wyss was thus entitled to oppose a deal that required him to subsidize a better deal for the minority stockholders by subjecting him to a different and worse form of consideration. To hold otherwise would turn on its head the basic tenet that controllers have a right to vote their shares in their own interest.[90] Put simply, minority stockholders are not entitled to get a deal on better terms that what is being offered to the controller, and the fact that the controller would not accede to that deal does not create a disabling conflict of interest.[91]

88. *See CompuCom*, 2005 WL 2481325, at *7 n. 37 (rejecting claim that minority shareholders were "entitled to more per share consideration than ... the controlling shareholder" as unsupported by Delaware law); *cf. Bershad v. Curtiss–Wright Corp.*, 535 A.2d 840, 845 (Del. 1987) ("Clearly, a stockholder is under no duty to sell its holdings in a corporation, even if it is a majority shareholder, merely because the sale would profit the minority.").

89. 1993 WL 443406, at *7 (Del.Ch. Oct. 29, 1993).

90. *See Bershad*, 535 A.2d at 845 ("Stockholders in Delaware corporations have a right to control and vote their shares in their own interest."); *Tanzer v. Int'l Gen. Indus., Inc.*, 379 A.2d 1121, 1123 (Del.1977) ("[W]e are well aware that a majority stockholder has its rights, too. And among these is exercising a fundamental right of a stockholder in a Delaware corporation; namely, the right to vote its shares."), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983); *see also Williams v. Geier*, 671 A.2d 1368, 1380–81 (Del.1996) ("Stockholders (even a controlling stockholder bloc) may properly vote in their own economic interest[.]").

91. The plaintiffs have not relied in any way on the pleading-stage decision in *McMullin v. Beran*, 765 A.2d 910 (Del.2000). That case involved a merger in which the parent and minority stockholders of the subsidiary received identical consideration, but the Supreme Court accepted the contention that a duty of loyalty claim could be filed against the parent for negotiating an "immediate all-cash [t]ransaction" to satisfy a liquidity need by accepting as true the plaintiff's allegation that the full value of the subsidiary "might have been realized in a differently timed or structured agreement." *Id.* at 921. In particular, the plaintiff argued that the controller—which shared the control premium from a cash deal ratably with the minority after a logical and deliberate search for buyers—had allegedly excluded bidders willing to offer a higher priced stock deal and took a lower valued cash deal instead. I have noted on prior occasions that *McMullin* was a controversial decision, in part because "[t]ransactions where the minority receive the same consideration as the majority, particularly a majority entitled to sell its own position for a premium, had long been thought to fall within the ambit of non-conflict transactions subject to business judgment rule protection." *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 202 n. 95 (Del.Ch.2006) (citing in part *Puma v. Marriott*, 283 A.2d 693 (Del. Ch.1971)), *aff'd*, 931 A.2d 438 (Del.2007); *see also In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1013 n. 57 (Del.Ch.2005) (noting "odd[ity]" of *McMullin*); Gilson & Gordon, *supra* note 66, at 815 n. 115 (in the context of discussing *McMullin*, noting the danger of imposing a higher standard of review "when the controlling shareholder allows the minority to participate ratably in a control sale than when the minority is excluded from such a sale"). The financial aspect of that decision that puzzles me is this. *McMullin* seems to contemplate that that it was disloyal for the controlling stockholder to accept an all-cash deal in part because a "differently ... structured" deal (*e.g.*, a stock-for-stock deal) "might have" delivered more shareholder value, but the controller accepted a lower-valued all-cash deal because of its need to use that cash to fund an acquisition of a separate company. *McMullin*, 765 A.2d at 921. But, this reasoning glosses over the reality that the present value of stock depends on the currency value into which it can be converted, plain and simple. For example,

At oral argument, the plaintiffs recognized that their second liquidity-based "self-sacrifice" argument was weak. They therefore pivoted to their third theory, which is an auction schoolmarm version. Backed away from the "self-sacrifice" theory that they so emphatically pursued in their complaint and briefing, the plaintiffs made two key concessions and related clarifying points. First, the plaintiffs conceded that Wyss was under no fiduciary obligation to accept the equity retention requirement of the Partial Company Bid.[92] Instead, what the plaintiffs now say they take issue with is Wyss' supposed failure to suggest that the Board continue negotiating with the PE Club to explore whether it would be willing to "at least maybe bring down the [equity] percentage that [it was] asking [Wyss] to take."[93] In other words, the plaintiffs contend that Wyss and the Board somehow acted disloyally by failing to further engage the PE Club after it had made its Partial Company Bid, which it indicated was a final bid reflecting the highest price they could pay and that required Wyss to roll over a "substantial" part of his equity shares.[94]

Aside from the fact that any equity retention requirement at all solely directed to Wyss would make the proposed deal different and less favorable from the one offered to the minority, what is problematic for the plaintiffs is the lack of any well-pled allegations that Wyss or the Board somehow foreclosed the PE Club from making another offer once it was clear that the Board rejected its joint bid. Rather,

let's imagine that there had been another bidder in *McMullin* that offered a nominally higher per share price (let's say, $60.00 per share, as opposed to $57.75 per share consideration offered in that case) with consideration in the form of 100% stock. Imagine further that the stock was easily convertible into cash. All things being equal, the controlling stockholder would have no reason to prefer a cash deal at $57.75 per share when it could get a stock deal at $60.00 per share and simply sell the stock on the market to get that higher value in cash, assuming minimal transaction costs.

Now, let's imagine that the stock being offered by that bidder was stock in a private company, or one with a very thin public float. And, to turn that stock into actual dollars to buy things, the controlling stockholder might not be able to get $60.00 per share. Instead, assume that it would have to suffer a marketability or liquidity discount of 15–20% per share. As a matter of economic realities, the $60 stock deal is not worth $60 but 85% of $60, or $51 per share. $51 per share is worth less than $57.75 per share and under *QVC* and other authority is clearly not the highest immediate value reasonably obtainable. *See Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 44 (Del.1994) (citing cases). Delaware law does not require a controller to take less value for its shares than the minority, and if a bidder cannot turn its own acquisition currency into *cash* at the value it puts on that currency, it admits the currency has a lower value.

Putting aside these contentions, however, *McMullin* is inapplicable here, for the basic reason that the Partial Company Bid was not an all shares bid, but rather an offer to buy the public float unaffiliated with Wyss and to force Wyss to remain as a minority investor. Whatever *McMullin* does stand for, it certainly does not purport to require a majority stockholder to agree to a "differently timed or structured agreement" when that agreement maximizes value for only *some* shares, and makes the controller sacrifice its own legitimate interests in liquidity to subsidize the minority's favorable exit. *See, e.g., Mendel v. Carroll*, 651 A.2d 297, 305 (Del.Ch.1994) ("Because the Pensler proposed $27.80 price was a price that contemplated not simply the purchase of non-controlling stock, as did the Carroll Family Merger, but complete control over the corporation, it was not fairly comparable to the per-share price proposed by the Carroll Group.").

92. *E.g.*, Tr. 41 ("We certainly don't think that it's a breach of fiduciary duty for [ ] Wyss to not want to be tethered to another [private company].").

93. Tr. 43.

94. *See* Compl. ¶ 74; Proxy Statement at 27.

the pled facts clearly show that Wyss and the Board were receptive to a private equity overture: the private equity firms were invited to the negotiating table even when talks with J & J were underway; they signed confidentiality agreements; they were given access to due diligence; and when they asked to club together for purposes of marshaling their financial resources to make a joint bid, they were allowed to do so. From this series of accommodating moves, I do not see how I can rationally infer from the pled facts that Wyss would have been hostile to a higher value bid for all shares by the PE Club if it were willing to make one. Wyss would have had more to gain than anyone from such a bid. A favorable all-cash, all-shares bid would have fully served the liquidity interest the plaintiffs' say Wyss had.

Perhaps as would be expected of a "back up to a back up" argument, this one is constructed not from facts actually pled in the complaint, but from a lack of detail in the Proxy Statement, on which the plaintiffs' allegations rely. The Proxy Statement clearly notes the concerns the Board had with the Partial Company Bid, including that it required Wyss to roll over a "substantial" part of his equity. The Proxy Statement also clearly states that the Partial Company Bid could not be raised.

But the Proxy Statement does not indicate that the PE Club was told the reasons why the Partial Company Bid was rejected. From that omission, the plaintiffs argue that they will never know whether the PE Club was willing to make such a bid based on the inference that it was never formally asked to bid again.[95] That is, the plaintiffs ask me to infer that there was radio silence from Synthes to the PE Club about the Partial Company Bid and that the PE Club was too shy and emotionally wounded by the silence to make a new bid. Thus, the plaintiffs have revived the notion that current M & A bidders are too "genteel to make even the politest of uninvited overtures," and a "cotillion of the reticent" whose fragile sensibilities render them incapable of handling any form of or even possibility of rejection.[96]

But that view of the world is nonsensical. Private equity buyers are not middle schoolers nervous about asking a date to a dance. And the private equity buyers here were not uninvited, on the pled facts. They were invited by Synthes and Wyss to make a bid.[97] Not only that, they were allowed to club together to make a better bid because in isolation they didn't have the wallet to make a favorable bid for a company as large as Synthes.[98] The PE Club then put in a bid that involved it paying approximately $14.7 billion for control of Synthes,[99] which it stated was the best it could do. That bid was not for all of Synthes, but required Wyss to remain a substantial investor.[100]

95. *E.g.,* Tr. 70.

96. *In re Toys "R" Us, Inc. S'holder Litig.,* 877 A.2d 975, 1006 (Del.Ch.2005).

97. *E.g.,* Compl. ¶ 69 (alleging that Credit Suisse contacted the private equity firms); *id.* ¶ 70 (alleging that Synthes gave the private equity firms access to due diligence following the entry into confidentiality agreements).

98. *See id.* ¶ 73.

99. Assuming exchange ratios as of February 11, 2011, and assuming that Wyss would keep

a 20% equity stake in the post-merger entity. See *supra* note 27, for a further explanation of this approximation of the value of the Partial Company Bid taking into account Wyss' rollover.

100. The plaintiffs' argument is also belied by the great takeover cases that gave rise to the very doctrines that the plaintiffs now use to impugn the Board—such as *Revlon* and *Unocal*—in which bidders were not shy about making hostile, unsolicited bids for companies that they wanted to buy. The notion that private equity buyers are not assertive enough

In my view, the complaint does not provide a rational basis to infer that the PE Club was not told the reasons for the rejection of the Partial Company Bid. A primary theory of the complaint was that the Partial Company Bid was rejected improperly because the PE Club needed Wyss to retain a substantial equity position, presumably to help it finance its purchase of the minority's equity.[101] On that theory, the PE Club went away not because it was ignorant of why its bid was rejected but because it could or would not buy all of Synthes' equity.

But even if, contrary to the complaint's suggestion, the PE Club was just met with silence and no further engagement, that does not support any basis to invoke the entire fairness standard. Rather, that is a tactical quibble about how the Board and Wyss handled the strategic dynamic of negotiations.

That sort of tactical quibble would not even support a *Revlon* claim in my view, if *Revlon* applied, which it does not for reasons I will soon explain. No pled facts

support the inference that Wyss and the other members of the Board would not have been ecstatic to receive a higher all-shares, all-cash bid from the PE Club. So, too, there is no pled reason to believe that Synthes' financial advisor, which likely stood to gain a higher fee for a higher deal price, would have lacked an incentive to urge the PE Club to step up its bid and meet the all-shares benchmark. If, therefore, a tactical decision was made to react to a disappointing Partial Company Bid by silence, that judgment is impossible to second-guess as unreasonably or poorly motivated.[102]

Silence is a form of negotiation. Synthes had been actively engaging with the individual private equity firms for months and allowed them to club. If Synthes felt the Partial Company Bid was not good, the PE Club would know that it needed to do better. If the PE Club decided not to do so, there is no rational basis on the pled facts to conceive that was because it was too shy to make a new bid, rather than that the PE Club was adher-

---

to lob in a non-public bid would seem to contradict experience, as revealed by iconic cases such as *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261 (Del.1989) (KKR acting on a "tip" from board and prevailing in the bidding war for the company), and *In Re RJR Nabisco, Inc. Shareholders Litigation*, 1989 WL 7036 (Del.Ch. Jan. 31, 1989) (bidding war between KKR and proposed management buyout group, which KKR entered even though it had been "rebuffed in [its] effort to entice management to join it in a leveraged buyout"), and by more recent examples, like the bidding war between Apollo Management and KSL Capital Partners for Great Wolfs Resorts, *see* Michael J. De La Merced, *Apollo Raises Offer Again for Great Wolf Resorts*, N.Y. Times Dealbook, Apr. 20, 2012, http://dealbook.nytimes.com/2012/04/20/apollo-raises-offer-again-for-great-wolf-resorts. For further examples of recent deal-jumping activity, see generally Robert E. Spatt & Peter Martelli, *The Four Ring Circus—Round Sixteen: A Further Updated View of the Mating Dance among Announced Merger*

*Partners and an Unsolicited Second or Third Bidder* (Simpson Thatcher & Bartlett LLP Feb. 17, 2012), *available at* http://www.stblaw.com/FourRingUpdates2012.pdf.

101. *E.g.*, Compl. ¶¶ 74–75.

102. *See Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del.1994) ("[A] court applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination."); *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 600 (Del.Ch.2010) ("[W]hen the record reveals no basis to question the board's good faith desire to attain the proper end, the court will be more likely to defer to the board's judgment about the means to get there.").

ing to its prior statement that it could not raise its price and needed Wyss to roll a substantial part of his equity.

Other pled facts make the plaintiffs' argument that the PE Club was too shy to make an improved bid inconceivable. As the plaintiffs admitted at oral argument, they have no basis to believe that the PE Club had the financial wherewithal to outbid J & J.[103] Thus, not only was the Partial Company Bid at CHF 151 at a lower price than what J & J agreed to pay in the Merger, but there are no pled facts supporting an inference that the PE Club was able to offer an all-cash bid that was higher than what a strategic buyer like J & J could afford to pay, given J & J's resources and the synergies that were likely available to it, and not to the PE Club, a group of financial buyers.

Nor does it invoke the entire fairness standard or state a *Revlon* claim that the plaintiffs say that the Board did not use the presence of the PE Club on the scene as a way of getting J & J to offer a better deal. According to the plaintiffs, "any time that [the PE Club] made an offer, [the Board] could get J & J to go higher" because "it was clear [J & J] wanted the company."[104] The plaintiffs blithely argue that the Board should have played a game of lack-of-disclosure chicken with J & J by suggesting to J & J that it had the PE Club firmly on the hook, a ruse that would have been helped by going through the motions with the PE Club. Although they don't say, the plaintiffs suggest that Wyss and Synthes should have led both the PE Club and J & J on, by telling the PE Club falsely that Wyss would roll a substantial part of his equity if it raised its price for

the rest of the shares, while telling J & J that another deal that the Board and Wyss would support was in the making. This is yet another theory unsupported by pled facts or by our law.

The complaint indicates that the Synthes Board in fact used the PE Club as a way to get J & J to improve its bid in a credible way. The complaint says that Khoury, the lead independent director, "informed J & J that the [PE Club] had outbid [it], and consequently, Synthes could not accept [its] proposal of CHF 145–150 per share and would only accept a price of CHF 160 per share."[105] This set the stage for the final round of bargaining, during which Synthes was able to get J & J to increase its offer from CHF 145–150 per share (approximately $166 per share[106]) to CHF 159 per share (approximately $179 per share[107]), remarkably close to the CHF 160 per share price it had used as its top-end figure to negotiate against J & J.

The plaintiffs' suggestion that the duty of loyalty required the Synthes Board to be more brazen and deceive J & J into believing that a rival was in the game willing to pay more than J & J for all the shares when they had no basis to believe that to be true is not consistent with our law. Even when *Revlon* applies, it requires only that a board take reasonable measures to ensure that it gets the highest price reasonably attainable. It does not require a board to engage in deceptive or even edgy negotiating tactics.[108] Such tactics are not only unseemly, but also have real economic costs.

103. Tr. 33, 35.

104. Tr. 44.

105. Compl. ¶ 76.

106. Using exchange rates as of April 24, 2011.

107. Also using exchange rates as of April 24, 2011.

108. *See Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del.1994).

Imagine if Synthes had given J & J a false impression about the interest of the PE Club in buying all of Synthes' equity and J & J had gotten wind of that. J & J may well have decided to bag the whole deal, figuring that if it could not trust the seller on that issue, why should it be confident that the representations and warranties Synthes was making were solid, rather than equally squishy, and that it was not going to put over $20 billion of its own value at risk buying Synthes.

For all these reasons, I conclude that the plaintiffs have not pled facts supporting an inference that Wyss' interest in obtaining liquidity in a sale of Synthes constituted a conflict of interest justifying the invocation of the entire fairness standard and supporting a finding that the complaint pleads a non-exculpated duty of loyalty claim. Rather, the pled facts demonstrate that Wyss received equal treatment in the Merger and that the business judgment rule applies to the Board's decision to approve the Merger.[109]

**109.** The plaintiffs, who are U.S. based institutional investors who knowingly bought shares in Synthes, a Swiss-headquartered company whose shares were listed on the SIX Exchange, make another argument about why the entire fairness doctrine should apply to the Merger. This argument is almost impossible to understand and is based on the notion that Wyss, and presumably the other Swiss-domiciled directors of Synthes, were conflicted because Swiss law did not impose the same level of taxation on the exchange of Synthes shares for the Merger consideration as U.S. law did on U.S. taxpayers. No pled facts support the inference that the Synthes Board had before it a choice of structuring a transaction that was favorable to U.S. stockholders and somehow preferred a transaction that was tax-efficient for Swiss stockholders. In fact, the plaintiffs' primary theory is that Wyss and the Board somehow acted unfairly by failing to accept the Partial Company Bid, which was a cash bid that would have subjected U.S. taxpaying stockholders to exactly the same tax treatment as the Merger with J & J. Furthermore, even if this were a situation where a board had to make a zero-sum structuring choice and chose to make the structure more tax-efficient for stockholders in the nation where the company's stock was listed on an exchange, this court should be chary about calling conflict simply because some directors, as would be logical, also lived in that nation. So long as it was likely that a large number of stockholders were domiciled in the nation where the company's stock was listed, on what basis other than xenophobia is there to require special treatment for U.S. stockholders? The flexibility given to boards of Delaware corporations facilitates the creation of wealth through the corporate form; a common law rule calling "conflict transac-

tion" whenever a Delaware corporation with a diverse, international tax base engages in M & A activity subject to different tax treatment at the stockholder level in many nations would diminish the wealth-creating objective of our law and inhibit Delaware corporations from competing in a global economy. The plaintiffs' argument comes with ill grace, too, as they purport to seek to represent a class of all Synthes stockholders, not simply those who are U.S.-based. *See* Compl. ¶ 37. Also as to this point, the plaintiffs entirely fail to demonstrate the materiality of this issue to Wyss, which is their pleading burden, *see, e.g., Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 363 (Del.1993) (stating principle); *Orman v. Cullman,* 794 A.2d 5, 23 (Del.Ch.2002) (same), and why he would have preferred any particular bidder over any other because of tax treatment, given that the plaintiffs mostly simply believe that our nation's oxymoronic "long term" (*i.e.,* one year) capital gains rate of 15% (which is less than the 20% rate in place in 2000 and the 28% rate in place before that during the Reagan era, and less than the current top U.S. income tax rate of 35%) is not as generous as the tax system in Switzerland. Not only that, the plaintiffs fail to articulate any coherent theory about the tax treatment that Swiss stockholders in fact received, making their argument impossible to grasp. *See* Johnson & Johnson, Current Report (Form 8–K), Ex. 99.1, at 3 (June 12, 2012) (indicating that under Swiss law, the same tax treatment was likely to be given to stock or cash received in the Merger). For all these reasons, this impossible-to-understand argument does not provide a basis to invoke the entire fairness standard.

The plaintiffs do advance another tax-based argument that is easier to understand. The plaintiffs allege that Wyss persuaded the

**D. The Plaintiffs' Revlon And Unocal Arguments Fail As Well**

■ The plaintiffs contend that the business judgment rule does not apply on the separate ground that the Merger implicates enhanced scrutiny under *Revlon*,[110] because it is an "end stage" transaction in which Synthes' shareholders will only own 7% of the surviving entity.[111] According to them, this is the last chance for the Synthes minority stockholders to receive a premium for their Synthes shares and thus on the basis of transcript dictum cited by the plaintiffs in their brief, the Merger invokes the *Revlon* standard of review.

As an initial matter, I note that even if *Revlon* applied, for the reasons discussed at length above, there are no pled facts from which I could infer that Wyss and the Board did not choose a reasonable course of action to ensure that Synthes stockholders received the highest value reasonably attainable.[112] Thus, even if *Revlon* applied, the complaint fails to state a viable claim.

But, the plaintiffs are also wrong on the merits of their argument that *Revlon* applies. Their sole basis for claiming that *Revlon* applies is that the Synthes stockholders are receiving mixed consideration of 65% J & J stock and 35% cash for their Synthes stock, and that this blended consideration represents the last chance they have to get a premium for their Synthes shares. But under binding authority of our Supreme Court as set forth in *QVC* and its progeny, *Revlon* duties only apply when a corporation undertakes a transaction that results in the sale or change of control.[113] Putting aside the reality that the plaintiffs (under their own theory) were moving from a company under the control of Wyss to receiving stock in company that had no controlling stockholder, and thus is already an odd case to apply *Revlon*,[114] the mixed consideration Merger

---

Board to push back the date of the stockholder meeting on the Merger in order to allow him to transfer more of his Synthes stock into tax-free accounts, allowing him to reap even more tax benefits than the other stockholders. But, this argument fails as well, for at least two reasons. First, the plaintiffs do not allege that other Synthes stockholders would not also have desired this same time in order to undertake planning transactions to make the Merger more tax-efficient for themselves. Indeed, at the time that Wyss made this request (June 28, 2011), the Merger Agreement had already been announced, so Synthes stockholders were on notice of the need to make suitable tax-planning preparations. *See* Compl. Ex. C. Second, at oral argument the plaintiffs conceded that the minority stockholders were not harmed in any way by the vote's timing, *see* Tr. 53–54, and nor could they, since the Merger consideration was to be determined as of the effective date of the Merger (*i.e.*, closing) and the Merger would not close for another year due to regulatory review.

**110.** *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 176 (Del.1986).

**111.** Compl. ¶ 95.

**112.** *See Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43–44 (Del.1994).

**113.** *See id.* at 43–47.

**114.** In this regard, the court's comments in *In re NCS Healthcare, Inc., Shareholders Litigation* ("*Omnicare*"), are particularly appropriate. In that case, the court noted that:

The situation presented on this motion does not involve a change of control. On the contrary, this case can be seen as the obverse of a typical *Revlon* case. Before the transaction ... is completed, [the target company] remains controlled by the [controlling stockholder]. The record shows that, as a result of the proposed ... merger, [the target's] stockholders will become stockholders in a company that has no controlling stockholder or group. Instead, they will be stockholders in a company subject to an open and fluid market for control. 825 A.2d 240, 254–55 (Del.Ch.2002), *rev'd on other grounds*, *Omni Care, Inc. v. NCS Healthcare, Inc.*, 822 A.2d 397 (Del.2002).

does not qualify as a change of control under our Supreme Court's precedent. A change of control "does not occur for purposes of *Revlon* where control of the corporation remains, post-merger, in a large, fluid market." [115] Here, the Merger consideration consists of a mix of 65% stock and 35% cash, with the stock portion being stock in a company whose shares are held in large, fluid market. In the case of *In re Santa Fe Pacific Corp. Shareholder Litigation*, the Supreme Court held that a merger transaction involving nearly equivalent consideration of 33% cash and 67%

stock did not trigger *Revlon* review when there was no basis to infer that the stock portion of that consideration was stock in a controlled company. [116] That decision is binding precedent. [117]

Similarly, the plaintiffs' half-hearted challenge to the Merger Agreement's deal protections fails too. [118] They have made no attempt to show how the deal protections would have unreasonably precluded the emergence of a genuine topping bidder willing to make a materially higher bid, and thus fail to state a claim. [119] Although J & J had locked up a large number of

---

115. *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *5 (Del.Ch. Sept. 30, 2009).

116. 669 A.2d 59, 71 (Del.1995).

117. *Id.* The plaintiffs do not argue that the Board's initial consideration of a range of strategic options, including all-cash bids, compels a different result. In my view, that sort of argument has more logical force because it can be viewed as odd that a board should be relieved of its duties under *Revlon* in a situation when it has made the strategic decision to sell the company but selects as the highest bid a stock deal that is not technically a change of control. If, in that situation, it turned out that the final round of bidding was tainted by favoritism toward the winning bidder, would the fact that the winner paid in stock logically mean that the board was not, in real time, subject to *Revlon* duties? In any event, the plaintiffs do not press this point, and if they did, they would have had to address, which they did not, the Supreme Court's decision in *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270 (Del.1994), which did not apply *Revlon* in a situation where a board was looking to sell for the highest value but ultimately accepted a stock deal, *id.* at 1289–90, or this court's decision on the point in *Omnicare*, 825 A.2d at 254–55. If those decisions were to be questioned, one would have to answer whether extending *Revlon's* myopic focus on immediate value would be optimal. So long as boards are held to their *Unocal* duties to avoid precluding better bids or coercing approval of their own preferred deal and to their duty of loyalty (which would require that any discrimination in bids

be based on proper concerns), why shouldn't the board choose the deal it believed was best on a long-term basis for stockholders and present that to them for their acceptance? And if the best deal was one that the board could ordinarily implement itself if it had not shopped the company openly, why should an unconflicted board with *more* market knowledge have less flexibility to choose the option that it believed was best?

118. As the attentive reader will recall, the deal protections agreed to by the Board include a 3.05% termination fee; a no-solicitation provision with a fiduciary out; matching rights; a "force-the-vote" provision; and the Voting Agreement locking up 37% (or 33% upon a change in the Board's recommendation) of Wyss' and his affiliates' shares in favor of the Merger.

119. *See, e.g., In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 120 (Del.Ch.2007) (stating that a termination fee of 3.5% of equity value "is hardly of the magnitude that should deter a serious rival bid"); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 506 (Del.Ch.2000) ("The presence of [a standard no-shop] provision in a merger agreement is hardly indicative of a *Revlon* (or *Unocal*) breach."); *In re Lear Corp.*, 926 A.2d at 120 ("[M]atch rights are hardly novel and have been upheld by this court when coupled with termination fees despite the additional obstacle they are present."); *In re Answers Corp. Shareholders Litig.*, 2011 WL 1366780, at *4 (Del.Ch. Apr. 11, 2011) (voting agreement locking up 27% of the vote in favor of the proposed merger is perfectly legal did not make the proposed

Wyss' shares in favor of the Merger, that level was far less than a majority, and even less in a force-the-vote context. If a better topping bid was available, Synthes' stockholders could have voted down the Merger and opened the door to that better bid.[120] Likewise, the plaintiffs acknowledge that the deal protections that J & J granted came at the end of an open process whereby logical buyers were invited to obtain due diligence on Synthes and to make bids free from the inhibiting effect of any deal with an initial bidder. Thus, because the Board had deliberately searched the market and was seeking to close a favorable deal with the last remaining bidder, it had a firm market basis to make the decision about how likely a later emerging bid was and to judge what concessions in terms of deal protections were necessary in order to land the one huge fish it actually had on the hook. This court should be particularly reluctant to deem unreasonable a board's decision to use deal protections as part of the negotiating strategy to pull the best bid from the final bidder or bidders who emerge from an open process on the theory that some party that has already had a chance to make a real bid without having to hurdle any deal protection barrier at all will somehow come to a different realization of the company's value, or that some unexpected bidder will emerge from an unexplored and overlooked dusty corner of our well-scoured capital markets. That sort of tactical judgment is freighted with none of the concerns about disloyalty that animate *Unocal* and *Revlon*,[121] and is one that courts are ill-equipped to second guess as unreasonable.[122] For that reason, this court has made clear that when there has been a "good faith negotiation process in which the target board has reasonably granted [deal] protections in order to obtain a good result for the stockholders, there [are] no grounds for judicial intrusion."[123] I adhere to that principle here.

## V. *Conclusion*

In conclusion, the plaintiffs have failed to state a non-exculpated claim for breach of fiduciary duty against any of the defendants. Accordingly, the defendants' motion to dismiss is GRANTED WITH PREJUDICE.

IT IS SO ORDERED.

---

transaction "a fait accompli" and did not appear impermissibly coercive).

**120.** *See Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1387–88 (Del.1995).

**121.** *See Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 180 (Del.1986) (discussing the oft-quoted "omnipresent specter" rationale for enhanced scrutiny under *Unocal* ).

**122.** *E.g., In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 577 (Del.Ch.2010) ("When directors who are well motivated, have displayed no entrenchment motivation over several years, and who diligently involve themselves in the deal process choose a course of action, this court should be reluctant to second-guess their actions as unreasonable."). ·

**123.** *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1021 (Del.Ch.2005).