# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| ARON ENGLISH and RICHARD PEPPE, Individually and on Behalf of All Similarly Situated Individuals, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2018-0221-AGB |
| CHARLES K. NARANG, PAUL A. DILLAHAY, JAMES P. ALLEN, PAUL V. LOMBARDI, CINDY E. MORAN, AUSTIN J. YERKS, DANIEL R. YOUNG, CLOUD INTERMEDIATE HOLDINGS, LLC, CLOUD MERGER SUB, INC., and H.I.G. CAPITAL, LLC, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: December 18, 2018
Date Decided: March 20, 2019

Blake A. Bennett, COOCH AND TAYLOR, P.A., Wilmington, Delaware; W. Scott Holleman and Garam Choe, JOHNSON FISTEL, LLP, New York, New York; *Counsel for Plaintiffs*.

Elena C. Norman and Daniel M. Kirshenbaum, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Joshua Z. Rabinovitz, KIRKLAND & ELLIS LLP, Chicago, Illinois; Devora W. Allon, KIRKLAND & ELLIS LLP, New York, New York; *Counsel for Defendants*.

**BOUCHARD, C.**

In January 2016, the board of directors of NCI, Inc. engaged two financial advisors to solicit interest in a sale of the company. In July 2017, after a sale process that lasted eighteen months and resulted in at least five other firms expressing interest in acquiring NCI, the company entered into a merger agreement to sell the company for $20 per share in cash to affiliates of H.I.G. Capital, LLC. The transaction was structured as a tender offer followed by a merger. Charles Narang, NCI's founder who held about 34% of NCI's shares and about 83.5% of the company's voting power, tendered his shares for the same per-share consideration that every other stockholder received in the transaction.

In March 2018, over seven months after the transaction closed, two former stockholders of NCI filed this action asserting claims against NCI's directors for breach of fiduciary duty and against H.I.G. and its affiliates for aiding and abetting breaches of fiduciary duty. Defendants moved to dismiss these claims under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. Their lead argument is that the complaint must be dismissed under *Corwin v. KKR Financial Holding LLC*[1] because a majority (approximately 73.6%) of NCI's disinterested stockholders tendered their shares in an uncoerced and fully-informed tender offer, subjecting the transaction to business judgment review.

---

[1] 125 A.3d 304 (Del. 2015).

Plaintiffs advance two reasons why they believe *Corwin* should not apply. First, they contend that the transaction should be subjected to entire fairness review on the theory that Narang orchestrated a sale of the company for less than fair value to address a personal need for liquidity prompted by his retirement as the company's CEO in 2015 at seventy-three years of age. Second, they contend that the other stockholders who tendered their shares were not fully informed when they did so because the recommendation statement for the transaction was misleading and omitted material information.

For the reasons explained below, the court concludes that neither of plaintiffs' theories against applying *Corwin* holds water based on the facts plead in the complaint and this court's precedents. Thus, the transaction is subject to business judgment review and plaintiffs' claims must be dismissed for failure to state a claim for relief.

## I. BACKGROUND

The facts recited herein are taken from the Verified Class Action Complaint filed on March 28, 2018 (the "Complaint") and documents incorporated therein.[2]

---

[2] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (citation omitted) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss). The Complaint references more than 35 times and incorporates therein a recommendation statement issued in connection with the commencement of the tender offer (hereafter, the "Recommendation Statement"). Def.'s Opening Br. Ex. 1 (Dkt. 17). References to the Recommendation Statement are specifically cited.

Any additional facts are either not subject to reasonable dispute or subject to judicial notice.

### A.    The Players

NCI, Inc. ("NCI" or the "Company") is a Delaware corporation headquartered in Virginia that provides enterprise solutions and services to United States "defense, intelligence, health and civilian government agencies."[3]   Before the transaction at issue (the "Transaction"), NCI had two classes of common stock:  (i) Class A shares with one vote per share that traded publicly and (ii) Class B shares with ten votes per share that were convertible into Class A shares on a one-for-one basis.

Plaintiffs Aron English and Richard Peppe allege they owned shares of NCI common stock at all relevant times.  The number of shares they held is not alleged.

The individual defendants consist of the seven members of NCI's board of directors (the "Board") when it approved the Transaction.  Defendant Charles K. Narang was the Company's CEO and Chairman of the Board from its formation until October 1, 2015, and continued to serve as Chairman of the Board until the Transaction closed in August 2017.  Narang also was NCI's largest stockholder.  As of December 31, 2016, Narang owned 117,659 shares or 1.3% of the Class A shares outstanding and 4.5 million shares or 100% of the Class B shares outstanding.  This

---

[3] Compl. ¶¶ 41, 43-44.

3

equated to 34% of NCI's total number of shares of common stock outstanding and 83.5% of the Company's total voting power.[4]

Defendant Paul A. Dillahay served as NCI's President and CEO and as a director from October 31, 2016 through the completion of the Transaction. Defendants James P. Allen, Paul V. Lombardi, Cindy E. Moran, Austin J. Yerks, and Daniel R. Young were all directors of NCI who are not alleged to have had any management positions with the Company.

Defendant H.I.G. Capital LLC ("H.I.G."), a Delaware limited liability company headquartered in Miami, Florida, is a global private equity investment firm. The remaining two defendants are Delaware entities affiliated with H.I.G.: Cloud Intermediate Holdings, LLC and its subsidiary, Cloud Merger Sub, Inc. These three entities are collectively referred to as the "H.I.G. Defendants."

### B. Narang's Tenure as NCI's CEO

In 1989, Narang established the predecessor of NCI (NCI Information Systems, Inc.) as a Virginia corporation. NCI acquired that entity in 2005 as part of a plan to take the Company public. In 2015, after a twenty-six-year tenure as the Company's CEO, Narang decided to step down from that role. On July 29, 2015, NCI issued a press release announcing that Narang would be stepping down as CEO.

---

[4] *Id.* ¶¶ 52-55. The Narang Family Trust controlled 1,412,000 or approximately 15.6% of the Class A shares, but Narang did not have direct control over those shares. *Id.* ¶ 56.

NCI's incoming CEO, Brian J. Clark, stated in the press release that NCI "intend[ed] to explore new strategic avenues for the company . . . includ[ing] acquisitions and other options."[5]

## C. NCI Retains Advisors and Begins a Sale Process

In January 2016, the Board engaged two financial advisors—Wells Fargo Securities, LLC and Stifel, Nicolaus & Company, Inc.—to pursue a sale of the Company. During the first half of 2016, Wells Fargo and Stifel contacted "various potential buyers" but only one party emerged as a serious bidder—a private equity firm known as Party A.[6] It subsequently withdrew from the process because of regulatory concerns relating to one of Party A's portfolio companies.

On October 16, 2016, Clark unexpectedly resigned as CEO after serving in the position for little more than one year. Dillahay later was appointed as NCI's new CEO.

## D. H.I.G. Enters the Sale Process

In November 2016 and January 2017, NCI representatives received unsolicited communications from H.I.G., expressing interest in meeting with

---

[5] *Id.* ¶ 77.

[6] *Id.* ¶ 83. The Recommendation Statement, referenced in this paragraph of the Complaint, actually explains that Wells Fargo and Stifel "contacted 33 potential buyers" during the first half of 2016, "17 of which expressed initial interest in a possible transaction with NCI." Defs.' Opening Br. Ex. 1 at 16.

Dillahay to discuss a potential business relationship. Discussions ceased for a time after NCI announced on January 23, 2017 that its former controller had embezzled nearly $20 million from the Company between January 2010 and January 2017.

On February 22, 2017, H.I.G. reinitiated contact with NCI to discuss its business operations and express H.I.G.'s desire to buy NCI. On March 8, 2017, H.I.G. contacted Dillahay and proposed acquiring NCI for $18 per share. Two days later, NCI received interest from another private equity firm ("Party C") to acquire NCI for $19 per share. In response, the Board instructed Dillahay to contact H.I.G. to advise it of the existence of another buyer and to request that H.I.G. increase its offer to $20 per share. Three days later, H.I.G. contacted Dillahay and indicated that H.I.G. was willing to offer between $19 and $21 per share, which was later memorialized in writing.

On March 16, 2017, Party C submitted a revised bid to acquire NCI for $20 per share. The next day, the Board met with Wells Fargo and Stifel to discuss the status of negotiations with H.I.G. and Party C. Dillahay later had discussions with the founder of Party C about the possibility of NCI acquiring an entity controlled by Party C's founder, but the Board vetoed this idea on March 29, 2017.

On April 5, 2017, NCI announced its earnings for both the full year and fourth quarter ended on December 31, 2016. During an investor conference call held that day to discuss NCI's results, Dillahay discussed a strategic growth plan for the

6

Company that focused on three issues: (1) ensuring that the Company's personnel were well-equipped for NCI's business, (2) "increasing operational performance to improve margins," and (3) "overhaul[ing] the business pipeline to focus on larger, more profitable opportunities."[7] During this call, Dillahay also underscored that NCI possessed a lot of untapped potential, noted improving market conditions that bode well for NCI's success, and expressed confidence in NCI's ability to execute the plan. Dillahay further noted that "NCI's win rates and recompetes have been 90-plus percent, exceeding the industry average of around 65%."[8] After the April 5 investor call, NCI's stock price immediately jumped.

On April 19, 2017, NCI received an indication that Party A was interested in acquiring NCI for $20 per share, and received updated offers from H.I.G. for $19 per share and Party C for $20 per share. On April 24, 2017, Dillahay and NCI's CFO had a dinner meeting with "Party E," a leading provider of IT services to the United States government, during which they indicated that Party E would need to move quickly if it wished to acquire NCI. Party E submitted a non-binding indication of interest the next day with a price between $18 and $20 per share. During this time period, NCI also received inquiries from "Party B" and "Party D,"

---

[7] Compl. ¶¶ 99-100.

[8] *Id.* ¶ 174.

but talks broke down because Party B held a minority interest in a competitor of NCI and Party D's proposal valued NCI between only $200 million and $235 million.

During an earnings call on May 9, 2017, Dillahay highlighted "the progress [NCI is] making in implementing [its] strategic turnaround plan" and commented that NCI's pipeline had increased in the past month.[9]

On May 10 and 11, 2017, NCI hosted presentations for representatives of Parties A, C, E, and H.I.G., after which H.I.G. increased its bid to $20 per share and the remaining parties withdrew from the process. Parties A and C both indicated they were concerned with risks associated with the "recompete process," referring to the Company's ability to win the next contract on a particular project after completing the first contract. Party C also was concerned about the uncertainty of the timing of NCI's strategic turnaround plan, and Party E stated that its calculation of synergies was lower than previously expected and it needed more information to bid.

E.    NCI Grants H.I.G. Exclusivity

On May 27, 2017, NCI granted H.I.G. exclusivity through June 13, 2017 and agreed to pay H.I.G.'s expenses if NCI pursued an alternative transaction. The exclusivity period was later extended to June 18, 2017 without any additional

---

[9] *Id.* ¶¶ 176-77.

consideration. H.I.G. was given access to speak directly with some of NCI's customers, without an NCI representative participating on the calls. When the exclusivity period expired, NCI did not try to contact any other potential buyers.

On June 26, 2017, H.I.G. notified NCI that it was prepared to move forward with acquiring NCI for $20 per share. NCI shares were trading at $21.15 per share at that time. Also on June 26, "a representative of Wells Fargo contacted a representative of H.I.G. to inform it that NCI was proposing transaction and retention bonuses for certain key employees in the aggregate amount of approximately 1.75 million."[10]

On June 27, 2017, the NCI Board met to discuss H.I.G.'s proposal. During the meeting, Wells Fargo and Stifel presented a summary of their preliminary financial analyses of the H.I.G. proposal. After the meeting, Wells Fargo informed H.I.G. that the aggregate amount of the proposed transaction and retention bonuses NCI intended to make would be $1.25 million, including a $300,000 bonus for Dillahay.[11] On June 29, 2017, during an NCI Board meeting, Wells Fargo and Stifel discussed their financial analyses of H.I.G.'s proposal and provided fairness

---

[10] *Id.* ¶ 123.

[11] According to the Recommendation Statement, the retention bonuses were "to be paid to NCI employees in connection with the closing of the Transactions. . . . who made significant contributions to the success of the transaction and such retention bonuses would be paid to employees whose continued employment, through the closing, is necessary to HIG's assuming operation of the business or to the Company's continued operation of the business in the event the closing does not occur." Defs.' Opening Br. Ex. 1 at 26-27.

opinions on the $20 per share price. During the meeting, the Board voted to enter into the merger agreement.

### F. The Merger Agreement and Tender Offer

On July 2, 2017, NCI and H.I.G. affiliates Cloud Intermediate Holdings, LLC and Cloud Merger Sub, Inc. executed an Agreement and Plan of Merger (the "Merger Agreement") under which H.I.G., through its affiliates, would acquire all of NCI's outstanding common stock for $20 per share or approximately $283 million in total through an all-cash tender offer to be followed by a merger. On July 3, NCI issued a press release announcing the execution of the Merger Agreement. On June 30, 2017, the last day of trading before the acquisition was announced, NCI's shares closed at $21.20.

The Merger Agreement contained a number of deal protections, including a "no solicitation" provision that prohibited NCI from soliciting alternative proposals but also contained a "fiduciary out" provision allowing the Board to consider a superior proposal in limited circumstances. The Merger Agreement also contained a matching rights provision and a termination fee of approximately $11 million, representing approximately 4% of the implied enterprise value of the Transaction.[12]

_____

[12] Compl. ¶¶ 154-56. The Merger Agreement also included a 7% reverse termination fee if H.I.G. backed out of the Transaction. Defs.' Opening Br. Ex. 1 at 31.

In connection with the execution of the Merger Agreement, Narang entered into a tender and support agreement to tender all of his shares to H.I.G., and the other directors and certain members of NCI's management indicated that they would tender their shares as well. As a group, these individuals accounted for approximately 35% of the outstanding shares of NCI.

On July 17, 2017, NCI filed the Recommendation Statement on Schedule 14D-9, and the tender offer commenced. The tender offer expired twenty-five days later, on August 11, 2017. In response to the tender offer, NCI stockholders (including Narang) tendered 11,924,366 shares, representing "approximately 82%" of the total shares outstanding.[13] Excluding the shares Narang held and tendered, approximately 73.6% of the outstanding shares were tendered.[14] The merger closed on August 15, 2017, four days after the tender offer expired.

---

[13] Defs.' Opening Br. Ex. 2 at 2 (Aug. 15, 2017 SEC Form 8-K) ("[A]s of the Expiration Time, a total of 11,924,366 Shares had been validly tendered and not validly withdrawn pursuant to the Offer, which tendered shares represent approximately 82.0% of the voting power of the Shares outstanding on a fully-diluted basis (assuming that the Class B Shares converted to Class A Shares upon consummation of the Offer, the exercise of all options and the vesting of all restricted stock awards).") (Dkt. 17). The court takes judicial notice of this information, which plaintiffs do not question, because it is not subject to reasonable dispute. *See* D.R.E. 201(b). Extrapolating from the 82% figure in this disclosure, the total number of outstanding shares was approximately 14,541,909.

[14] Narang held 4,617,659 common shares, consisting of 117,659 Class A shares and 4.5 million Class B shares. Compl. ¶ 52. The 73.6% figure is derived by dividing (i) the number of shares tendered less Narang's shares (11,924,366 − 4,617,659 = 7,306,707) by (ii) the total number of shares outstanding less Narang's shares (14,541,909 − 4,617,659 = 9,924,250).

11

## II.    PROCEDURAL HISTORY

On March 28, 2018, plaintiffs filed the Complaint, asserting two claims. Count I asserts a claim for breach of fiduciary duties against the individual defendants, contending that they "sanctioned a process and price that was not entirely fair" and "failed to disclose material information."[15] Count II asserts a claim for aiding and abetting against the H.I.G. Defendants.

On May 14, 2018, defendants filed a motion to dismiss the Complaint in its entirety under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. The court heard argument on the motion on December 18, 2018.

## III.    ANALYSIS

The standards governing a motion to dismiss for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[16]

---

[15] *Id.* ¶ 196.

[16] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations omitted).

Defendants' primary argument for dismissal is based on *Corwin v. KKR Financial Holdings LLC*[17] and its progeny.[18] Under *Corwin*, "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[19] "[S]tockholder approval of a merger under Section 251(h) by accepting a tender offer has the same cleansing effect as a vote in favor of that merger."[20] As our Supreme Court has explained:

> When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result. That is because the vestigial waste exception has long had little real-world relevance, because it has been understood that stockholders would be unlikely to approve a transaction that is wasteful.[21]

Defendants argue that plaintiffs have not pled facts sufficient to trigger entire fairness review and that the Transaction is thus subject to the business judgment rule under *Corwin* because it was approved by a fully informed, uncoerced vote of the disinterested stockholders, *i.e.*, a 73.6% majority of the stockholders other than Narang who tendered their shares in the tender offer. It is not disputed that a majority

---

[17] 125 A.3d 304 (Del. 2015).

[18] Defendants also argue that the Complaint should be dismissed for failure to plead a breach of the duty of loyalty against any of the individual defendants. Because this case must be dismissed under *Corwin*, the court does not reach that issue.

[19] *Id.* at 309.

[20] *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 738 (Del. Ch. 2016), *aff'd*, 156 A.3d 697 (2017) (TABLE).

[21] *Singh v. Attenborough*, 137 A.3d 151, 151-52 (Del. 2016) (Strine, C.J.).

13

of disinterested stockholders tendered their shares in connection with the Transaction or that the Transaction was uncoerced.

Plaintiffs advance essentially two arguments for why *Corwin* does not apply. First, they argue that entire fairness should apply on the theory that Narang, NCI's controlling stockholder, was conflicted in the Transaction because of his need for liquidity. Second, they argue that the vote was not fully informed based on three alleged deficiencies in the Recommendation Statement. The court addresses each of these arguments in turn below.

## A. The Transaction Is Not Subject to Entire Fairness Review

Entire fairness is "Delaware's most onerous standard."[22] "Once entire fairness applies, the defendants must establish 'to the court's satisfaction that the transaction was the product of both fair dealing *and* fair price.'"[23] "[C]ontrolling stockholders are not automatically subject to entire fairness review when a controlled corporation effectuates a transaction. Rather, the controller also must engage in a conflicted transaction for entire fairness to apply."[24] "Conflicted transactions include those in

---

[22] *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 44 (Del. Ch. 2013).

[23] *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *31 (Del. Ch. Oct. 16, 2018) (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995)).

[24] *IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6 (Del. Ch. Dec. 11, 2017) (internal quotation marks omitted).

14

which the controller stands on both sides of the deal"[25]—which does not apply here since a third party acquired all of NCI's shares—and those "where the controller gets a unique benefit by extracting something uniquely valuable to the controller."[26]

Plaintiffs argue that entire fairness should apply here because "Narang controlled NCI and was conflicted with respect to the Acquisition" in that it afforded him a "unique benefit" to address his "need or desire for liquidity."[27] In support of this argument, plaintiffs rely heavily on this court's decision in *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*[28] Defendants disagree. They contend that "Narang's ownership of NCI stock *aligned* his interests with other stockholders" and that the Complaint does not plead facts necessary to support entire fairness review under a "need for liquidity" theory.[29] In support of their position, defendants rely

---

[25] *Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016).

[26] *Crane*, 2017 WL 7053964, at *6 (internal quotation marks and citation omitted); *see also In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *11-15 (Del. Ch. Jan. 25, 2016) (collecting cases and stating that "the entire fairness framework governs any transaction between a controller and the controlled corporation in which the controller receives a non-ratable benefit"); *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014) ("The second variety of controller transactions implicating entire fairness review involves situations where the controller does not stand on both sides of the transaction, but nonetheless receives different consideration or derives some unique benefit from the transaction not shared with the common stockholders.").

[27] Pls.' Opp'n Br. 20, 22-23.

[28] 2011 WL 4825888 (Del. Ch. Sept. 30, 2011, revised Oct. 6, 2011).

[29] Defs.' Opening Br. 15-16. In a footnote, defendants also contend that Narang "was not controlling in the context of the acquisition." *Id.* at 14 n.9. This issue was not fully briefed

heavily on this court's decision in *In re Synthes, Inc. Shareholder Litigation.*[30] The court begins by discussing the two key cases on which the parties rely before turning to analyze the allegations of the Complaint.

In *infoGROUP*, a stockholder challenged a third-party acquisition of *info*GROUP, Inc. that allegedly was orchestrated by the company's founder and 37% stockholder Vinod Gupta "so that Gupta could obtain desperately needed liquidity."[31] The complaint specifically alleged that Gupta "owed over $12 million as a result of [prior] derivative and SEC settlements," had over $13 million of debt from loans used to buy *info*GROUP stock, "had not received a salary since leaving his job as CEO under the terms of the derivative settlement," "did not hold investments that provided him with 'meaningful cash,'" planned to launch a new business to be funded with his own money, and that the company's board had "repeatedly discussed" his "liquidity problems."[32] The court found that these "well-pleaded facts . . . support an inference that the liquidity benefit received by Gupta was a personal benefit not equally shared by other shareholders" such that he

---

and need not be addressed given the court's conclusion that Narang was not conflicted in connection with the Transaction.

[30] 50 A.3d 1022 (Del. Ch. 2012).

[31] 2011 WL 4825888, at * 2.

[32] *Id.* at *2-3.

16

"suffered a disabling interest" as a director with respect to the transaction.[33] Based on this finding, and its inference that Gupta dominated his fellow directors and rendered "them non-independent for purposes of voting on the Merger," the court concluded that plaintiff's loyalty claim stated a claim for relief.[34]

In *Synthes,* which was decided one year after *infoGROUP*, the court considered another "liquidity-based" challenge to a third-party acquisition of a company involving a stockholder (Hansjoerg Wyss) who allegedly controlled 52% of the company's shares.[35] Chief Justice Strine, writing as Chancellor, ultimately declined to apply entire fairness review to the transaction and dismissed the complaint for failure to state a claim for relief despite "hints" in the complaint "that as Wyss aged, he was anxious to get out of Synthes and that this anxiety drove the strategic process of the company in a way that was unfair to the minority."[36] In doing so, the court expounded on the type of circumstances where a need for liquidity could create a disabling conflict of interest for a controlling stockholder, as follows:

> It may be that there are very narrow circumstances in which a controlling stockholder's immediate need for liquidity could constitute a disabling conflict of interest irrespective of pro rata treatment. Those circumstances would have to involve a crisis, fire sale where the controller, in order to satisfy an exigent need (such as a margin call or

---

[33] *Id.* at *10.

[34] *Id.* at *11.

[35] 50 A.3d at 1025.

[36] *Id.* at 1034-35.

17

default in a larger investment) agreed to a sale of the corporation without any effort to make logical buyers aware of the chance to [buy], give them a chance to do due diligence, and to raise the financing necessary to make a bid that would reflect the genuine fair market value of the corporation.[37]

With this framework in mind, the court found that "there are no well-pled facts to suggest that Wyss forced a crisis sale of Synthes to J & J in order to satisfy some urgent need for cash," noting plaintiff's failure to allege facts suggesting that Wyss had tried to sell his stock "in whole or in substantial part" after stepping down as CEO, that Wyss (rather than the board) initiated the sale process, or that the process was rushed or unreasonably restricted.[38]

In my opinion, the alleged facts here are similar to those pled in *Synthes* and bear no resemblance to those pled in *infoGROUP*. As discussed next, the Complaint contains no concrete facts from which it reasonably can be inferred that Narang had an exigent or immediate need for liquidity.

The crux of plaintiffs' case, as described in their brief, is that once Narang decided to retire in mid-2015 at seventy-three years of age, he "needed to liquidate his position as part of his estate planning and wealth management strategy" because "his NCI holdings accounted for nearly all of his net worth."[39] Accepting as true

---

[37] *Id.* at 1036.

[38] *Id.* at 1036-37.

[39] Pls.' Opp'n Br. 23.

18

plaintiffs' assertion that Narang's holdings in NCI accounted for nearly all of his net worth—an assertion that is lean on factual support,[40] plaintiffs have not identified any *allegations of fact* in the Complaint about Narang's estate planning or wealth management strategy to support the inference that he was seeking to liquidate his shares quickly. To be more specific, the Complaint discusses what plaintiffs contend a "prudent" or "suitable" approach to investing and estate planning would be during retirement as a "general matter," but plaintiffs make no connection between their views on those subjects and Narang's *actual* investment strategy or objectives.[41]

Plaintiffs' contention in their brief that Narang unsuccessfully had "attempted to unload his shares on the open market" before the Transaction is similarly devoid of factual support in the Complaint.[42] Plaintiffs plead no specifics in the Complaint—such as the dates and amounts of Narang's stock sales—to back up this contention. There is no legitimate excuse for failing to plead this information since, as plaintiffs admit, it should be readily available in public filings.[43] The only

---

[40] Plaintiffs' assertion that Narang's NCI holdings accounted for nearly all of his net worth appears to be based on research from public sources that likely would not provide a full picture of Narang's sources of wealth. *See* Compl. ¶ 64 (Narang "had no other discernible significant business interests, and Plaintiff's counsel's public records searches did not reveal any extensive real estate holdings.").

[41] *See id.* ¶¶ 66-71.

[42] Pls.' Opp'n Br. 23.

[43] When pressed during oral argument about the lack of specifics in the Complaint about Narang's stock trades, plaintiffs' counsel suggested that the court take judicial notice of his

allegation in the Complaint about Narang's selling NCI shares is plaintiffs' non-specific assertion that "Narang did, in fact, attempt to sell some of his shares on the open market beginning in late 2015."[44]  Narang's SEC filing for this transaction shows, however, that Narang sold pursuant to a 10b5-1 plan only 9,610 shares of NCI, equating to less than 0.2% of his NCI stock at the time—hardly an attempt to "unload" his position.[45]

What the Complaint does plead factually is that, after founding NCI in 1989, Narang had accumulated a large stake in the Company over the course of his twenty-six-year career as its CEO, and two additional years as Chairman, worth more than $90 million at the Transaction price.[46]  In other words, Narang was a wealthy man when he decided to retire from his day-to-day responsibilities as the CEO of NCI with a large stake in the Company.  But, critically, as in *Synthes*, there are no facts pled in the Complaint that "support a basis for conceiving that [Narang] wanted or needed to get out of [NCI] at any price, as opposed to having [millions] of reasons to make sure that when he exited, he did so at full value."[47]

---

"SEC filings."  Tr. 37 (Dkt. 33).  As much as the Court of Chancery prides itself on its diligence, it is not responsible for doing a litigant's work.

[44] Compl. ¶ 74.

[45] Defs.' Reply Br. Ex. 4.

[46] Compl. ¶¶ 40-42, 141.

[47] *Synthes*, 50 A.3d at 1037.

The facts plead here are dramatically different than the situation in *infoGROUP*, as plaintiffs concede.[48] Unlike there, the Complaint in this case is devoid of any facts suggesting, for example, that Narang had *any*—much less significant—debt obligations, needed to exit his position in NCI in order to pursue a new business venture, or had admitted to others a need for liquidity.

Nor do the facts pled in the Complaint support a reasonable inference that NCI was sold in a crisis or "fire sale" without any effort to make logical buyers aware of the chance to bid or to give them a meaningful chance to do so. To the contrary, the Complaint acknowledges that the sale process extended over a period of more than eighteen months from late 2015 until the Merger Agreement was signed in July 2017;[49] that the Board decided to initiate the process by engaging two financial advisors in January 2016, Wells Fargo and Stifel;[50] that those advisors contacted numerous potential buyers;[51] that at least five firms other than H.I.G.—both strategic and financial firms—expressed interest in the Company but none was prepared to

---

[48] Tr. 41 ("And admittedly, [this situation is] not the fire sale situation that was involved in *infoGROUP*.").

[49] Compl. ¶¶ 2, 80.

[50] *Id.* ¶¶ 80-81.

[51] *Id.* ¶ 83.

21

pay more than H.I.G.;[52] that H.I.G. initiated contact with the Company and not the other way around;[53] and that the final decision to enter into the Merger Agreement was made by a seven-person Board that included five directors other than Narang who are not alleged to have had any management positions with the Company and whose independence is not seriously questioned.[54]

In sum, plaintiffs have failed to plead facts to support a reasonable inference that Narang's retirement as NCI's CEO posed some sort of exigency or emergency situation where he needed liquidity fast so as to create a disabling conflict of interest with respect to the Transaction.[55] Accordingly, no basis exists to subject the Board's consideration of the Transaction to entire fairness review.

---

[52] *Id.* ¶¶ 83, 92, 95, 97-98, 104, 107, 109-10, 112-14 (describing the nature and level of interest expressed by Parties A-E and whether those firms were financial or strategic buyers).

[53] *Id.* ¶¶ 86, 89.

[54] *Id.* ¶¶ 25-29, 128. The Complaint alleges that these five directors each received payments in the Transaction for their NCI shares and stock options ranging in value from approximately $136,000 to $890,000. *Id.* ¶¶ 25-29, 141. Because these payments were made at the same per-share price that all of NCI's other stockholders received, they reflect an alignment of interest with the other stockholders rather than any form of conflict. *See Iroquois Master Fund Ltd. v. Answers Corp.*, 2014 WL 7010777, at *1 n.1 (Del. Dec. 4, 2014) (TABLE) ("When a large stockholder supports a sales process and receives the same per share consideration as every other stockholder, that is ordinarily evidence of fairness. . . ."); *Synthes*, 50 A.3d at 1035 ("[W]hen a stockholder who is also a fiduciary receives the same consideration for her shares as the rest of the shareholders, their interests are aligned."). The only other benefit these five directors received in connection with the Transaction was a $3,500 per-meeting fee. Compl. ¶¶ 126, 141.

[55] *See Larkin*, 2016 WL 4485447, at *17-18 (concluding that a liquidity theory did not raise a pleadings-stage inference that a transaction was conflicted where "Plaintiffs failed to

22

### B. The Tender Offer Was Fully Informed

Plaintiffs' second line of attack for why *Corwin* should not apply in this case is that the stockholders were not fully informed during the tender process. Specifically, plaintiffs contend that the Recommendation Statement was deficient because: (i) "the Board made material misrepresentations or omissions regarding NCI's financial projections;" (ii) "the Board failed to disclose material information concerning potential conflicts of interest arising out of post-close opportunities for NCI's management;" and (iii) "the Board failed to disclose material information concerning potential conflicts affecting NCI's financial advisors."[56]

"Under Delaware law, when directors solicit stockholder action, they must disclose fully and fairly all material information within the board's control."[57] Information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[58]   Put

---

allege that any existing need for cash . . . was exigent" or that any need for cash was an "unusual crisis").

[56] Pls.' Opp'n Br. 35, 38, 40.

[57] *In re Solera Hldgs., Inc.*, 2017 WL 57839, at *9 (Del. Ch. Jan. 5, 2017) (internal quotation marks omitted).

[58] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994).

differently, information "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[59]

"[A] plaintiff challenging the decision to approve a transaction must first identify a deficiency in the operative disclosure document, at which point the burden would fall to defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote."[60] The plaintiffs identified in their Complaint three disclosure deficiencies in the Recommendation Statement.[61] For the reasons discussed next, the court concludes that defendants have established that each of these deficiencies fails as a matter of law and thus defendants have met their burden of showing that the vote was "fully informed."

### 1. The Recommendation Statement Did Not Misrepresent NCI's Financial Outlook with Respect to the Company Projections

Plaintiffs' lead argument for why the Recommendation Statement is misleading is that it "materially misrepresents NCI's financial outlook [by] disclosing financial projections [the 'Company Projections'] that understated the Company's upside and overstated certain risk factors."[62] Plaintiffs rest this argument

---

[59] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (adopting the materiality standard of *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[60] *Solera*, 2017 WL 57839, at *8; *see also Morrison v. Berry*, 191 A.3d 268, 282 n. 60 (Del. 2018) (agreeing with this statement of the law in *Solera*).

[61] Compl. ¶¶ 161-92.

[62] *Id.* ¶ 161.

24

on statements Dillahay made during two investor conference calls before the tender offer was commenced and in an article published after the Transaction closed.

Before turning to plaintiffs' allegations, it bears mentioning what plaintiffs do not argue. They do not contend that the disclosure concerning the Company Projections in the Recommendation Statement was incomplete or missing any information, or that management had prepared a different set of projections before the tender offer commenced that should have been disclosed. Nor do plaintiffs attempt to explain why the Board would want to include falsely pessimistic numbers in the Company Projections. Those projections were the same ones that were provided to potential acquirors.[63] Yet plaintiffs offer no logical reason why any of the members of the Board would want a lower price for the Company even if the Board had been rushing a sale of the Company.[64]

The two investor calls occurred in April and May 2017, about two to three months before the tender offer commenced. According to plaintiffs, Dillahay made statements during these calls that reflected optimism about NCI's prospects and

---

[63] Defs.' Opening Br. Ex. 1 at 47.

[64] *See In re BioClinica S'holder Litig.*, 2013 WL 5631233, at *6 (Del. Ch. Oct. 16, 2013) ("It seems highly unlikely that the BioClinica directors would have any incentive to artificially raise the capital expenditure estimates to the extent that it would depress the offer from JLL; their interests, like those of all the stockholders, was to the contrary.").

show that the Company Projections "grossly understated NCI's long-term prospects and overstated the Company's purported risks" in eight respects, namely:

> [T]he strength of NCI's customer relationships, the Company's strong positioning, the drastically improving market for NCI's products or services, the Company's confidence in its strategic plan, the timing of expected increases in revenue, NCI's longstanding success in earning repeat business, progress reports given during the second quarter of 2016, and the growing size in the Company's pipeline.[65]

The fundamental flaw in plaintiffs' argument is that Dillahay's statements do not reflect an inconsistency with the Company Projections sufficient to support a reasonable inference that they were materially false or misleading. Indeed, the Company Projections were generally positive: they projected a compound annual growth in revenue of 6.9% and compound annual growth rates of 11.7% of EBIT and 8.9% of Adjusted EBITDA.[66]

All eight of the grounds supporting plaintiffs' allegations speak to economic growth and opportunities, mostly in general terms, but none of them provide any quantitative support from which it is reasonably inferable that the Company Projections were misleading. For example, plaintiffs allege that Dillahay stated that NCI's "3-year pipeline increased from $4 billion to $4.3 billion and our qualified portion has grown from $2 billion to $2.4 billion."[67] But this pipeline increase is not

---

[65] Pls.' Opp'n Br. 36 (citing Compl. ¶¶ 168-78).

[66] Compl. ¶¶ 162-63.

[67] *Id.* ¶ 177.

inconsistent with the increase in revenues in the Company Projections and plaintiffs do not explain how this increase means that the Company Projections were false. Similarly, plaintiffs do not explain how general statements concerning the "Company's strong positioning" or "an improving market for NCI's products" are inconsistent with the Company Projections, which reflected a positive outlook. All eight factors that plaintiffs contend show inconsistencies suffer from this same flaw—in no case is it apparent why Dillahay's statements are inconsistent with any of the specific inputs or growth rates built into the Company Projections. At most, Dillahay's comments during the investor calls amount to "soft" statements or "puffery" about the Company's prospects, but none of them contradicts any aspect of the Company Projections sufficiently to support a reasonable inference that they were false or misleading.[68]

With respect to the post-close time period, plaintiffs focus on an article published on October 10, 2017, about two months after the Transaction closed. In that article, Dillahay allegedly "boasted about his plans to triple NCI's earnings in just three years" and his "ambitious goal" to grow EBITDA from approximately $30

---

[68] *See In re BJ's Wholesale Club S'holder Litig.*, 2013 WL 396202, at \*12 (Del. Ch. Jan. 31, 2013) (considering the fact that management's "assurances, however confident, of future performance are inherently speculative and easily modified" in dismissing a claim that the board relied in bad faith on their financial advisors' fairness opinion, which was based on poorer financial forecasts than the forecast that management's statements reflected).

million in 2017 to $100 million in 2020—"more than double the estimate for 2020 Adjusted EBITDA contained in the Company Projections."[69] Although these comments portray a rosier financial picture of NCI than the Company Projections, it is not reasonable to infer from them that the Company Projections were false or misleading as disclosed in the Recommendation Statement for at least two reasons.

First, Dillahay's statements concern a post-acquisition company under new ownership with a different funding source and a different capital structure. In other words, key aspects of the Company had changed from what they were before the Transaction closed. Second, the Recommendation Statement explains that the Company Projections were completed "prior to completing [the Company's] review of its first quarter financial results for 2017,"[70] which means that they were prepared about *six months* before Dillahay made his comments in October 2017. Given this significant gap in time, the intervening change of circumstances, and the aspirational nature of Dillahay's comments, which refer to "plans" and "ambitious goals," it is not reasonable to infer from Dillahay's comments that the Company Projections were false or misleading as portrayed in the Recommendation Statement.

---

[69] Compl. ¶ 180.

[70] Defs.' Opening Br. Ex. 1 at 47.

## 2. The Complaint Fails to Plead Facts to Support a Reasonable Inference that the Recommendation Statement Omitted Material Information About Post-Close Employment Discussions

Plaintiffs next argue that the Recommendation Statement "omits material concerning when, and the extent to which, discussions occurred regarding post-close employment opportunities for NCI management."[71] If discussions of this nature had occurred during the sale process, *i.e.*, before NCI entered into the Merger Agreement with H.I.G., they may reflect that the expected recipients of post-close employment opportunities had a reason to favor H.I.G. over another bidder and thus could be material to the stockholders in deciding whether or not to tender their shares.[72] The problem for plaintiffs is that the factual allegations in the Complaint do not support a reasonable inference that such discussions occurred at this time.

This court has held that "[i]f a disclosure document does not say that the board or its advisors did something, then the reader can infer that it did not happen."[73] It is not disputed that the Recommendation Statement, which devotes thirteen pages to

---

[71] Compl. ¶ 183.

[72] *See In re Topps Co. S'holders Litig.*, 926 A.2d 58, 74 (Del. Ch. 2007) (Strine, V.C.) ("As it currently stands, the Proxy Statement creates a misleading impression that Topps managers have been given no assurances about their future by Eisner. In reality, Eisner has premised his bid all along as one that is friendly to management and that depends on their retention.").

[73] *In re Sauer-Danfoss S'holders Litig.*, 65 A.3d 1116, 1132 (Del. Ch. 2011).

29

describe the background of the Transaction from January 2016 up to the announcement of the Merger Agreement on July 3, 2017,[74] does not discuss "the timing and extent of any discussions between NCI and H.I.G. regarding post-close employment."[75] Therefore, unless plaintiffs allege facts from which it reasonably can be inferred that such discussions occurred during the sale process, the logical inference is that they did not happen during that period.

Plaintiffs suggest that post-employment discussions with H.I.G. "likely" occurred based on two allegations, namely that: (i) NCI management knew before the acquisition "that H.I.G. routinely retains the existing management team to continue executing the business plans in place" and (ii) NCI announced in a Form 8-K filed on August 15, 2017, the date of the closing, that Dillahay and two other managers "would continue their employment in the post-Acquisition entity."[76] Focusing on the second allegation, plaintiffs argue that post-close employment discussions must have occurred before the closing if such arrangements were announced on the day of the closing.[77] This inference makes sense, of course, but misses the key point.

---

[74] *See* Defs.' Opening Br. Ex. 1 at 15-28.

[75] Pls.' Opp'n Br. 39.

[76] Compl. ¶¶ 184-86.

[77] *See* Tr. 56-57.

What is important for purposes of determining whether stockholders deciding whether or not to tender their shares received all material information is whether discussions about post-close employment occurred before the Company agreed to do a deal with H.I.G. This is because the issue that could create a conflict of interest and be material to stockholders in deciding whether to tender their shares is whether a fiduciary of the Company (*e.g.*, Dillahay) had a motive to play favorites *during the sale process* in order to secure post-close employment. In other words, to be material, post-close employment discussions must have occurred before the Merger Agreement was signed on July 2, 2017, which was more than six weeks before the Form 8-K disclosure.

Based on the allegations of the Complaint, it would be speculative—rather than reasonable—to infer that such discussions occurred during the sale process simply because H.I.G. has a reputation for retaining management.[78] Put differently, the only non-speculative, reasonable inference that can be drawn from the Complaint's allegations is that post-close employment discussions occurred at some point after execution of the Merger Agreement and before the announcement in the Form 8-K filing issued on the closing date. For the reasons explained above,

---

[78] *See BioClinica*, 2013 WL 5631233, at *10 (stating that "[t]he Plaintiffs have the burden of bringing claims based on actual facts and reasonable inferences, rather than speculation" and therefore dismissing a claim based on clauses that plaintiffs had no evidence even existed).

however, such an omission from the Recommendation Statement would not be material to stockholders in deciding whether or not to tender their shares.

### 3. The Recommendation Statement Adequately Discloses Past Work NCI's Financial Advisors Performed for H.I.G.

Plaintiffs' final disclosure challenge is that the Recommendation Statement "omits material concerning potential conflicts of interest affecting NCI's financial advisors," *i.e.*, that each financial advisor had previously performed work for H.I.G. or one of its portfolio entities.[79]

To be clear, what is not at issue is how much Wells Fargo and Stifel stood to receive in connection with their work on the Transaction and the conditions associated with receiving compensation for that work.[80] That information was fully disclosed to NCI's stockholders. Specifically, the Recommendation Statement explains that each firm was entitled to receive an "opinion fee" for providing a fairness opinion ($500,000 for Wells Fargo and $375,000 for Stifel) and a fee upon

---

[79] Compl. ¶ 191.

[80] *See In re Atheros Commc'ns, Inc. S'holder Litig.*, 2011 WL 864928, at *8 (Del. Ch. Mar. 4, 2011) ("Stockholders should know that their financial advisor, upon whom they are being asked to rely, stands to reap a large reward only if the transaction closes and, as a practical matter, only if the financial advisor renders a fairness opinion in favor of the transaction."); *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *8 (Del. Ch. June 27, 2008) ("[I]t is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts. . . . A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered in assessing how much credence to give its analysis.").

consummation of the Transaction based on its implied value, estimated to be approximately $2,750,000 for Wells Fargo and $2,030,000 for Stifel, and against which the opinion fee would be creditable to the extent previously paid.[81]

The issue here is disclosure about past work these advisors performed for H.I.G. or its affiliates that may have predisposed one or both of these advisors to favor H.I.G.'s bid for the Company over other bidders. Although the parties did not focus on it in their briefs, the Recommendation Statement provides a disclosure on past work that both of the Company's financial advisors performed for H.I.G. With respect to Wells Fargo the Recommendation Statement states, in relevant part, that:

> Wells Fargo Securities and/or its affiliates are lenders to or have otherwise extended credit to certain members of the HIG Group by means of, among other things, loans, letters of credit, financing leases and purchasing cards, [and] may in the future provide investment and commercial banking advice and services to, and may otherwise seek to expand its business and commercial relationships with, . . . members of the HIG Group.[82]

With respect to Stifel, the Recommendation Statement states, in relevant part, that:

> Other than the services provided by Stifel to NCI in connection with the Transactions and Stifel's opinion, there were no material relationships that existed during the two years prior to the date of Stifel's opinion or that were mutually understood to be contemplated in which any compensation was received or was intended to be received as a result of the relationship between Stifel and any party to the Transactions; Stifel notes that during such period, Stifel received

---

[81] Defs.' Opening Br. Ex. 1 at 39-40, 47.

[82] *Id.* at 40.

trading commissions from affiliates of [H.I.G.] in an aggregate amount significantly less than the Opinion Fee.[83]

Given the disclosures block-quoted above, and given the disclosure of the compensation Wells Fargo and Stifel each were entitled to receive for their work on the Transaction and the conditions upon which such compensation would be earned, it cannot be said that the Recommendation Statement omitted facts about past work Wells Fargo and Stifel performed for H.I.G. that "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" concerning the financial advisors' incentives in connection with the sale process.[84]  Accordingly, plaintiffs' third disclosure challenge is without merit.

* * * * *

In sum, each of plaintiffs' challenges to the Recommendation Statement fails to show that NCI's stockholders were not fully informed when deciding whether to tender their shares in connection with the Transaction, which indisputably received the uncoerced support of a majority of NCI's disinterested stockholders.  For this reason, and because entire fairness does not apply to the Transaction (as discussed above) and waste has not been alleged, the Transaction is governed by the business

---

[83] *Id.* at 47.

[84] *Arnold*, 650 A.2d at 1277.

34

judgment rule under *Corwin* and its progeny. Accordingly, Count I of the Complaint fails to state a claim for relief and must be dismissed.[85]

## C. The Aiding and Abetting Claim Fails to State a Claim for Relief

In Count II of the Complaint, plaintiffs assert that the H.I.G. Defendants aided and abetted the members of the Board in breaching their fiduciary duties with respect to their approval of the Transaction.

"Under Delaware law, a claim for aiding and abetting includes four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by the non-fiduciary defendants, and (iv) damages proximately caused by the breach."[86] "As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability."[87]

Here, because plaintiffs' breach of fiduciary duty claim fails to state a claim for relief against the individual defendants for the reasons explained above, the

---

[85] *See Singh*, 137 A.3d at 151-52.

[86] *Lee v. Pincus*, 2014 WL 6066108, at *13 (Del. Ch. Nov. 14, 2014) (internal quotation marks omitted).

[87] *In re Alloy, Inc. S'holder Litig.*, 2011 WL 4863716, at *14 (Del. Ch. Oct. 13, 2011); *see also Singh*, 137 A.3d at 153 (affirming dismissal of all claims, including an aiding and abetting claim, stating that "[h]aving correctly decided, however, that the stockholder vote was fully informed and voluntary, the Court of Chancery properly dismissed the plaintiffs' claims against all parties.").

aiding and abetting claim fails as well for lack of a predicate breach of duty.[88]

Accordingly, Count II will be dismissed.

## IV. CONCLUSION

For the reasons explained above, both counts of the Complaint fail to state a claim for relief. Accordingly, defendants' motion to dismiss is GRANTED, and the Complaint is dismissed with prejudice.

**IT IS SO ORDERED.**

---

[88] *See Volcano*, 143 A.3d at 750 (dismissing a claim under *Corwin* and the accompanying aiding and abetting claim by stating that "[a]n aiding and abetting claim . . . may be summarily dismissed based upon the failure of the breach of fiduciary duty claims against the director defendants.") (internal quotation marks omitted).